DRENNEN v. SOUTHERN STATES FIRE INS. CO. et al.*

(Circuit Court of Appeals, Fifth Circuit. April 18, 1918.)

No. 3031.

1. CORPORATIONS ⬤⟹320(11)—FRAUD OF DIRECTORS.

Evidence *held* sufficient to sustain a finding of conspiracy between members of interlocking directorates of two corporations, pursuant to which they diverted most of the assets of both corporations for their own personal benefit.

2. CORPORATIONS ⬤⟹560(12)—SUITS BY RECEIVERS—GROUNDS OF RECOVERY.

The general rule that a receiver for a corporation can recover only in the right of the corporation is not universally applicable, but the receiver represents, not only the corporation, but its creditors and stockholders, and is also an instrument of the court, and may be used to establish and protect the equitable rights of all parties in interest.

3. CORPORATIONS ⬤⟹316(1)—DIRECTORS—DEALINGS WITH CORPORATION.

A sale of property to a corporation by a director can be sustained only where there was good faith on the part of both the seller and of those who represented the corporation in the transaction.

4. FRAUD ⬤⟹58(1)—PROOF.

While fraud, when alleged, must be proved, it may be established, like any other fact, by evidence from which it must be inferred.

Walker, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of Alabama; William I. Grubb, Judge.

Suit in equity by Felix M. Drennen, receiver of the American Mortgage & Loan Company, against the Southern States Fire Insurance Company and others. Decree for defendants, and complainant appeals. Reversed.

J. L. Drennen, of Birmingham, Ala. (H. L. Stevens, of Warsaw, N. C., and Joseph E. Johnson, of Atlanta, Ga., on the brief), for appellant.

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied December 20, 1918.

Nathan L. Miller, of Birmingham, Ala., for appellee Southern States Fire Ins. Co.

Forney Johnston, John S. Stone, W. T. Hill, and Sterling A. Wood, all of Birmingham, Ala. (Richard V. Evans and Tillman, Bradley & Morrow, all of Birmingham Ala., J. H. Bankhead, Jr., of Jasper, Ala., and Lamkin & Watts, of Birmingham, Ala., on the brief), for other appellees.

Before WALKER and BATTS, Circuit Judges, and FOSTER, District Judge.

BATTS, Circuit Judge. The plaintiff, Drennen, as receiver of the American Mortgage & Loan Company, brings suit against the Southern States First Insurance Company, Sibley P. King, Sumter Cogswell, McLane Tilton, Eugene F. Enslen, J. G. Cooke, D. E. Manasco, and R. B. Watts. The allegations of the complaint are substantially to the effect following:

The Southern States Fire Insurance Company ceased active business in December, 1913. Defendants King and Watts were directors of both the American Mortgage & Loan Company (hereafter called the American Company) and the Southern States Fire Insurance Company (hereafter called the Insurance Company); defendant Enslen was a director and treasurer of both companies; defendant Manasco was the president and a director of the Insurance Company and one of the organizers and promoters of the American Company; defendant Tilton was director of the Insurance Company; defendant Cogswell a director, vice president, and general manager of the Insurance Company; defendant Cooke had been one of its directors. The defendants, other than the Insurance Company, being directors and officers of the companies as named, entered into a conspiracy to sell to the American Company 4,647 shares of the capital stock of the Insurance Company, and, in pursuance of the scheme, on February 2, 1914, with the fraudulent intent to enrich themselves at the expense of the American Company and its stockholders and creditors, and with the unlawful assistance of the Insurance Company, pretended to sell to the American Company the stock at $10 per share; said defendants knowing that the Insurance Company had ceased to do business, and that the price greatly exceeded the value of the stock. Defendants, pursuing the scheme to defraud, by and with the connivance of defendant E. F. Enslen, who was at that time president of the Jefferson County Savings Bank, obtained from the bank a temporary loan wherewith to partly finance the pretended purchase, until such time as they could obtain from the treasury of the Insurance Company the additional money required therefor, taking the money from the Insurance Company and pretending to loan it to the American Company, to be paid over by the latter in turn to the defendants. Defendants obtained the loan from the bank, and, with the connivance of Enslen, borrowed from the Insurance Company the additional money needed to effect their plans, and executed and delivered the promissory notes of the American Company, for the sums borrowed, to the Insurance Company, and deposited, with some of said notes as security, the identical 4,647 shares of stock that they pretended to sell, and paid over to themselves the sums of money borrowed. By pretending to sell the 4,647 shares to the American Company, defendants passed the shares from their hands into the custody and control of the Insurance Company, thereby ultimately taking out of the treasury of the American Company $46,470, for which it received and holds nothing in return. Defendant Insurance Company, by loaning or pretending to loan the American Company the sum of $3 a share on the 4,647 shares, made the fraud successful, and the effect was to gather into the treasury of the Insurance Company 4,647 shares, leaving the American Company with nothing whatever to show for the transaction, except its obligations to the Insurance Company for the pretended loans. After making the pretended sale of the 4,647 shares, the defendants, further pursuing the conspiracy, began systematically to loan, or pretend to loan, to the American Company large sums of money from the In-

surance Company, and then converted the money to themselves, or some of themselves, and their confederates. The ultimate effect of the wrongful acts was to leave the American Company indebted to the Insurance Company $50,053, with accumulated interest, and with nothing to discharge the indebtedness, except 16,684 shares of the capital stock of the Insurance Company, delivered as security for the pretended indebtedness, and all of which stock the Insurance Company is now threatening to dispose of for the purpose of paying the pretended indebtedness.

At the time of the transfer by the natural defendants of said 4,647 shares of the capital stock of the Insurance Company, the American Company had no money with which to pay the purchase price of the stock, and a part of the purchase price was obtained from the Jefferson County Savings Bank upon the notes of the American Company, secured by the stock and other securities, and the balance of the purchase price was evidenced by notes of the American Company, made payable to the natural defendants or some of them. Before the maturity of any of the notes given to the bank or the natural defendants, one J. A. Gorham, who was at the time president of the American Company, became also president of the Insurance Company, and was president at the time the notes matured. As the notes matured, sufficient money was obtained from the Insurance Company and applied in payment of the notes, and in this way all of the purchase price of the 4,647 shares was ultimately paid out of the loans of the Insurance Company, the notes of the American Company being given to the Insurance Company in evidence of the loans and in substitution of its notes to the bank and the natural defendants; the notes to the Insurance Company being secured by 16,684 shares of its own stock, and all of which it still has. Included in the 16,684 shares are the 4,647 shares obtained from the natural defendants. At the time of the loan Gorham was president of both corporations, and as such executed the notes and permitted them to be secured by the stock. The Insurance Company had knowledge, at the time the money was obtained, that it was being obtained for the purpose of being used to pay the purchase price of said shares of stock, and that the American Company would be unable to pay the money, and that said shares of stock would be sacrificed in order to repay the same; and it had knowledge of the fraud being perpetrated upon the American Company by the transfer of said 4,647 shares, and had knowledge that the fraud could not be consummated, except through the Insurance Company's furnishing the money with which to pay the purchase-price notes, and with such knowledge the Insurance Company actively participated and joined with the natural defendants in carrying out the fraud perpetrated upon the American Company, and with such knowledge assisted the natural defendants in thus placing beyond its reach and control the shares of stock belonging to the American Company, knowing that by loaning the money it would bring about the deprivation to the American Company of said shares of stock and perfect the injury resulting to the American Company by the transfer of said 4,647 shares of stock. By so doing the Insurance Company actively assisted the natural defendants in getting full payment of the purchase price of their shares of stock out of and through the assets belonging to the American Company, knowing of the injury being done and that it was not possible, except by its assistance.

The plaintiff prayed for a decree against the defendants for $46,470 and interest, and for a temporary order restraining the Insurance Company from selling or otherwise disposing of any of the American Company's collateral deposited with it as security.

On February 2, 1914, the natural defendants sold to the American Company 4,647 shares of the capital stock of the Insurance Company at $10 per share. The face value was $5, the nominal book value $5.61, and the evidence established a market value of not exceeding $3. The interest of the natural defendants in this stock was distributed as follows: Cooke and Manasco, 1,346; Cooke, Manasco, and Watts, 1,237; D. E. Manasco, 695; Sumter Cogswell, 452; McLane Tilton, 48; Sibley P. King, 250; E. F. Enslen, 619—a total of 4,647 shares. The

American Company on that day, February 2, 1914, borrowed $23,-183.67 from the Jefferson County Savings Bank, effecting the loan through the defendant Enslen, who was president of the bank. Of the money borrowed from the bank, $16,523.17 was paid to the bank to take up notes due the bank of Cooke, Manasco, and Watts; $3,520 was used to pay notes of Cooke, Manasco, and Watts to the Jasper Trust Company, and $1,400 to pay a note of Manasco and Cooke to W. J. Ruby; $1,500 of the amount was paid in cash to Cogswell, and $240 to McLane Tilton. At this time Manasco owed the American Company $950 for money previously borrowed, which he secured by depositing 165 shares of the Insurance Company stock. In the sale of the 4,647 shares the American Company charged him with this amount as cash. In the settlement of the balance of the $46,470, after deducting the $23,183.67 and the $950, the American Company gave its notes as follows: Cogswell, $3,020; Tilton, $240; King, $2,500; Enslen, $6,-190; Enslen, trustee, $796.33; Watts, $616.66; Cooke, $3,000; Cooke, $5,973.34. The notes bore 8 per cent. interest, and were afterwards paid by the American Company with money obtained from the Insurance Company.

The result of the transaction is that with 4,647 shares of stock, worth $13,941, according to the evidence, the natural defendants paid indebtedness (including that which they had incurred for the purchase of the stock) to the amount of $24,133.67, and obtained notes, which were subsequently paid, to the amount of $22,336.33. At this time R. P. Watts, S. P. King, and E. F. Enslen were directors, and the last-named also treasurer. Manasco had organized the company, but was not then a director. He was in control of the Insurance Company. Cooke, Cogswell, Tilton, King, and Enslen were officers of that company, and supported him in his control and policies. J. A. Gorham, president of the American, by whom, at least nominally, the purchase for the American was conducted, became, as the result of the purchase, president of the Insurance Company. On February 9, 1914, a week after the purchase by the American of the stock from the defendants, the transaction was ratified by the finance committee of the American Company. The members of the committee participating, according to the minutes, were T. P. West, L. J. Haley, G. T. Brazelton, R. L. Seals, and J. A. Gorham.

On the same day a committee, known as the "conservation committee" of the Insurance Company, consisting of its secretary, W. R. Major, an employé of Manasco, and the defendants Cogswell and Watts, mailed a letter to the stockholders of the Insurance Company, in which the committee states that the company had reinsured all of its business on the 3d of October, 1913, and that no policies had been issued since December of that year; that the officers found this course necessary because of continued excessive losses, and the application filed for receivership by a few of the stockholders; that the expenses of operating the company had been greatly reduced; that the losses were being adjusted and paid, and litigation disposed of as rapidly as possible; that if it were feasible to liquidate the company at that time, it ought to pay the stockholders approximately $5 per share; that, how-

ever, on account of litigation, outstanding contracts, and the law governing corporations, the company could not be dissolved; and that, pending the time when the company would be in position to distribute its assets, in the opinion of the committee, it would be to the interest of the stockholders to keep its funds invested and loaned upon high-class security. The letter concludes with a paragraph to the effect that, in accordance with the policy of the management to keep the stockholders informed, they report that the American Mortgage & Loan Company is offering to exchange with the stockholders of the Insurance Company its stock on a par basis; that the president is Mr. J. H. Gorham, a "well-known local business man, who, from the reports of his company, has been able to operate it at a very low expense." "This company," the letter says, "we are informed, has paid two cash dividends. From the records of our company it appears that the American Mortgage & Loan Company has already acquired a large amount of stock in our company."

On the next day a letter was mailed to the stockholders of the Insurance Company by E. F. Enslen, president of the Jefferson County Savings Bank, addressed to the American Company, in which he acknowledges receipt of the letter explaining the plan of exchange of American Company stock for Insurance Company stock, and expresses the opinion that the plan and opportunity "seems to me to be a good one," and stating that his bank would act as transfer agent. On the 23d of the same month the Jefferson County Savings Bank, in a letter to a stockholder of the Insurance Company, stated that the bank, as transfer agent, had, in accordance with the request of the stockholder, inclosed certificate for 10 shares of the capital stock of the American Company for 20 shares of the Insurance Company, and stating that the par value of the American was $10 per share, and the par value of the Insurance Company was $5.

On March 9th following, the finance committee of the American Company authorized an exchange of its stock for the stock of the Insurance Company on the basis of one share of American Company for two shares of the Insurance Company, and authorized its president, Gorham, to vote the stock of the Insurance Company owned by the American Company at the next meeting of the Insurance Company to be held on March 11th. Griffin Lamkin, partner of defendant Watts, and attorney for both companies, offered the resolution authorizing the exchange. The other members of the committee participating were Gorham, West, Brazelton, and Haley. On March 11th, stockholders of the Insurance Company elected J. A. Gorham, then president of the American Company, a director. He was then by the directors elected president of the Insurance Company. Defendants Watts, Enslen, and King were elected directors. Haley, at that time member of the finance committee of the American Company, was also elected a director. The companies had adjoining offices in the Jefferson County Savings Bank building.

Some of the notes executed by the American Company in part payment of the stock of the Insurance Company bought from the natural defendants matured on May 7, 1914. On that day the finance com-

mittee of the Insurance Company met and authorized the loan to the American Company of $3,000, to be evidenced by a note for that amount, secured by 700 of its own shares, and a loan of $7,000, to be evidenced by another note, and secured by 2,400 of its own shares. The finance committee consisted of defendant King, defendant Watts, defendant Enslen, L. J. Haley, Gorham, and two others. On the same day the finance committee of the American Company met, and Gorham, who was then president of both companies, presided. A resolution was passed to borrow $3,000 and $7,000, and to put up as security the Insurance Company stock indicated. Another resolution was to the effect that it accepted a certain mortgage then held by the Insurance Company, and known as the Morris mortgage, for the $7,000, instead of cash.

On May 30th following this mortgage was obtained from the Insurance Company, and on the same day was traded to the defendant S. P. King, in which trade his $2,500 note, given to him as part of the purchase money for the 4,647 shares of stock, was paid. On the next day the note for $796.33, given to the defendant E. F. Enslen as part of the purchase price of the 4,647 shares, was paid with interest. On June 2, 1914, the finance committee of the Insurance Company passed a resolution authorizing a loan of $20,000 for one year to the American Company, to be secured by 6,670 shares of its own stock. Those present at the meeting of the committee were Gorham, president of both companies, and defendants King, Enslen, and Watts, all directors of both companies, and Haley and one Mackey. This $20,000 was used in taking up notes given by the American Company to the Jefferson County Savings Bank on February 2, 1914, for money used in the purchase of the 4,647 shares of stock. On July 7, 1914, the note executed by the American Company to R. B. Watts for $616.66 as a part of the purchase price of the 4,647 shares was paid by the American Company, partly by check, and partly by new note. On August 11, 1914, the American Company paid the note executed by it to McLane Tilton for $240 as part of the purchase price of the 4,647 shares of stock.

On August 14, 1914, the finance committee of the Insurance Company met and directed the treasurer of the Insurance Company to loan the available funds of the company for periods of not longer than one year to the American Company, and to accept as security the stock of the Insurance Company at a value not exceeding $3 a share. At this meeting were present Gorham, Watts, Mackey, King, and Major, a majority of whom were directors of the American Company. On the same day President Gorham called the finance committee of the American Company, and they agreed to borrow $3,600 from the Insurance Company, and did borrow it, putting up 1,200 shares of stock as collateral. Upon the blanket authority of the finance committee of the Insurance Company, the American Company began to borrow sums from the Insurance Company, putting up stock at the rate of $3 per share. The first loan was on August 14th, the next on August 26th, for $6,300, and subsequently other loans were made.

On August 26, 1914, the day the American Company borrowed $6,300 from the Insurance Company, it paid one of the notes given

to the defendant Enslen for $1,045.74, paid $5,139.55 on note due defendant Cooke, and paid $327.29 claimed by Cooke as a commission; all these payments being included in one check, aggregating $6,185.29. On August 27, 1914, the American Company sold the Insurance Company its city lot for $3,000. On the same day the American Company paid the balance due on the note given defendant Watts, and paid the balance of $1,433.01 due on a note of Cooke, and also paid the $3,000 note due to Cooke; these notes being given Cooke as part of the purchase price of the 4,647 shares of stock.

The loans to the American Company by the Insurance Company continued until 16,684½ shares of the Insurance Company's stock were put up to secure loans aggregating $50,053.50. On February 2, 1914, when the American Company purchased the 4,647 shares of stock from the natural defendants, the American Company put up with the bank as collateral all its unincumbered property. This consisted of certificate of deposit for $4,000, a deed to 280 acres of land in Florida, and a deed to a city lot, which was afterwards sold to the Insurance Company for $3,000. On that day the American Company owned 348 shares of the Insurance Company stock. On that day it secured the 4,647 shares from the natural defendants. The balance of the stock acquired by the American Company was through the campaign to exchange its own stock for that of the Insurance Company. All of the stock so acquired was put up with the Insurance Company, except 80 or 90 shares.

The result of the transactions up to this time may be thus summarized: The American Company started with 348 shares of stock of the Insurance Company, $4,000 in cash, a city lot worth $3,000, land in Florida, and a note of Manasco for $950. It had acquired 16,684½ shares of the Insurance Company stock, all of which was hypothecated. It had parted with its title to the city lot. It had surrendered the Manasco note. It owed, as a result of its transactions, $50,053.50. The debt was the result of the acquisition of the 4,647 shares of stock procured from the defendants; for the balance of the stock its own stock, not paid for, was given. The result, so far as the Insurance Company was concerned, was that it had parted with a mortgage worth $7,000, and cash, $46,053.50, and had in exchange a city lot worth $3,000 and notes of the American Company for $50,053.50, secured by stock of the Insurance Company.

The result, so far as the individuals who had engaged in the transactions, a majority of whom were officers and directors of both companies, was: At the beginning Cooke, Manasco, and Watts owed the bank $21,443.67; Manasco owed $950 to the American Company; they owned together 3,278 shares of stock, worth $9,834. As the result of the transactions, entirely financed by the American Company and the Insurance Company, their indebtedness was paid, and they received $9,690 in cash, together with some interest. Sumter Cogswell owned 452 shares of stock, worth $1,356. He received as the result of the transactions, financed entirely by the American Company and the Insurance Company, $4,520, together with some interest. McLane Tilton owned 48 shares of stock, worth $144. He received $480 in cash.

S. P. King owned 250 shares of stock, worth $750. He received $2,500 cash. E. F. Enslen owned 619 shares of stock, worth $1,857. He received $6,190; he also received $796.33 in a note given him as trustee.

The further result of the operations was that the owners of more than 1,100 shares of stock of the Insurance Company, acting upon the misleading statements of officers of their company, exchanged their stock for a like amount of stock in the American Company, and thereafter had, instead of stock in a corporation with available assets of at least $50,053.50, a like amount of stock in a corporation that had substantially no assets, and debts aggregating at least $50,053. It will be observed that all of the money involved in these transactions was furnished by the Insurance Company. The period of time required for transferring these assets of the Insurance Company to the natural defendants was from February 2, 1914, to August 27, 1914.

The relationship of the parties who profited by the transaction, and of the parties who aided them in securing that to which they were not entitled, is indicated by the following statement: S. E. Manasco was the organizer of the American Company, and had been its president. While he was president, J. A. Gorham, who succeeded him as president, was its general manager. Manasco had also organized the Insurance Company, and at the time of the transactions he controlled it, as he and his friends had controlled it ever since its organization. Among the friends who co-operated with him in this control were Cooke, King, and Cogswell. Six of the defendants, King, Cogswell, Tilton, Enslen, Manasco, and Watts, were, on February 2, 1914, the date of the first act in the transfer of funds from the Insurance Company to the other defendants, directors of the Insurance Company. The defendants King, Tilton, Cogswell, Enslen, Manasco, and Watts were at that time members of the finance committee of the Insurance Company. The defendants Cogswell and Watts were members of the conservation committee of the Insurance Company, who signed the letter, the purpose of which was to induce the stockholders of the Insurance Company to exchange their stock for stock in the American Company. Cogswell was vice president and general manager of the Insurance Company. The law firm of Watts were attorneys for the Insurance Company.

On February 2, 1914, the defendants King, Enslen, and Watts were directors of the American Company. Enslen was at that time also its treasurer, and became a member of its finance committee on June 29, 1914. The law partner of R. B. Watts was a member of its finance committee. John G. Cooke was a stockholder of the Insurance Company, and a member of its appraising committee, and he had been a director. Defendants Cooke and Watts had indorsed notes at the Jefferson County Savings Bank for Manasco, and Cooke was acting as trustee for their stock which was in his name. A part of Manasco's stock stood in his name. L. J. Haley, not a defendant, was a member of the finance committee of the American Company, and while acting in this capacity he became a director and member of the finance committee of the Insurance Company. W. R. Major, not a

defendant, was a director and member of the finance committee, and secretary and treasurer of the Insurance Company, and received a salary from Manasco. He was also a member of the conservation committee which sent out the letter to the stockholders. He was instrumental in getting together some of the stock that was sold by the natural defendants to the American Company. J. A. Gorham had been general manager of the American Company while Manasco was its president, and succeeded him as president. He controlled the meeting of the Insurance Company in March, 1914, at which he was elected director; he succeeded Manasco as president of the Insurance Company. He was present at the finance committee meetings of both companies authorizing the loans by the Insurance Company to the American; and, while president of both companies, executed the American Company notes to the Insurance Company upon which the loans were made. Griffin Lamkin, not a defendant, was a law partner of defendant Watts. They were attorneys for the American Company and the Insurance Company. He was a member of the finance committee of the American, and offered the resolution at the meeting of that committee authorizing the exchange of stock. On March 11, 1914, he was a director of the American Company.

[1] The facts which have been heretofore detailed could very well be accepted by a trial judge as evidence of a conspiracy, the purpose of which was to accomplish that which was done. The American Company had been organized by Manasco, but was not doing any business, and much of its stock remained in the treasury unsubscribed. The only unincumbered property which it owned was a certificate of deposit for $4,000, a tract of land in Florida, a city lot in Birmingham, a note of Manasco for $950 (secured by 165 shares of Insurance Company stock, worth not more than $495), and 384 shares of the Insurance Company stock. So far as the evidence indicates, it had no sources of revenue, unless the certificate of deposit and the unsecured note of Manasco were drawing interest. The Insurance Company had been organized by Manasco, but it had been so operated, under the control of Manasco, that it was no longer able to do business. It had reinsured its risks and had suspended active operations. What its actual financial condition was at the time is very inadequately developed by the testimony; but it had on hand some money, which was apparently greatly needed by some of the natural defendants. A statement (called by its officers "an approximate statement of the financial condition of the company") of its assets and liabilities on December 31, 1913, showed cash in bank and office, $29,581.90. This statement, which, in the light of subsequent events, must have been very misleading, had been prepared for the uses of Manasco, but it was spread upon the minutes of the directors of the company. Upon the face of the books there was a surplus of $24,905.67, making the stock show a value in excess of par, or $5.61 for a share of par value of $5. Whatever may have been the value of the stock and the assets of the Insurance Company, it is apparent that the cash and liquid assets were sufficient to pay the price of the stock sold by the defendants to the American Company.

Manasco and the other defendants knew exactly the condition of the American Company, exactly the condition of the Insurance Company, and exactly what was required to pay their own debts and to secure the available assets of the Insurance Company. It would take no exercise of the imagination to assume that these persons devised the scheme by which the available assets of the Insurance Company were to be converted to their use. The process involved the acquisition of approximately 5,000 shares of the stock of the Insurance Company. A part of this stock was already on hand, being used as collateral to a loan from the Jefferson County Savings Bank. The additional shares were acquired. This stock was to be sold to the American Company. The American Company at the time was entirely without available funds, and entirely without funds of any kind sufficient to purchase this amount of stock at even its value, $3 a share. It was, of course, less able to purchase it at more than three times its value, $10 a share. This circumstance was one, however, which need not embarrass the defendants, for they were in a position, not only to have the American Company borrow money, but to have the Insurance Company lend it. It could be conceived that the scheme, therefore, involved the borrowing by the American Company from the Insurance Company of a sufficient amount of cash to pay them for their stock at a price greatly in excess of its value. The stock, however, which the American Company was to purchase, had to be used primarily as collateral for that part of its purchase price furnished by the defendant Enslen through his Jefferson County Savings Bank. The plan could, then, have involved the execution by the American Company of notes to the sellers of the stock for the balance of the purchase price, the amount not furnished by the bank.

In order to borrow money with which to pay these notes, it became necessary to secure additional collateral of some kind, and it could well be held that the scheme involved acquiring Insurance Company stock, and using that stock as collateral for a loan from the Insurance Company. The acquisition of such stock would, ordinarily, have required the use of money, and it could be conceived that it was not a part of the plan of the defendants that any money of their own should be used in their financial operations. It could be assumed the conspirators exercised the power which they had, and formed, from the directors of the Insurance Company, a committee to be called the "conservation committee," to address a letter to the stockholders of the Insurance Company, detailing the condition of the company and advising that its available assets be put in well-secured, interest-bearing notes pending the dissolution of the company, and stating that, in pursuance of the policy of keeping the stockholders advised, the stockholders were informed that the American Company had indicated a willingness to exchange its stock for the stock of the Insurance Company. It could be conceived that the design intentionally involved absence in the letter of information to the effect that the American Company was without revenue, and that its assets were much less than its obligations.

252 F.—50

The scheme of the conspirators might have involved the exchange of Insurance Company stock, which had at least some value (probably about $3 per share) for American Company stock, which had never been subscribed for, and upon which and for which nothing had ever been paid, and which carried along with it participation in the assets and business of a concern that had neither a net capital nor revenue. The plan could have involved the active campaign to secure this exchange of stock, as a result of which more than 11,000 shares of stock of the Insurance Company were exchanged for stock in the American. It might have involved, as these exchanges were consummated, the putting up of the Insurance Company stock as collateral with the Insurance Company, to borrow the money of the Insurance Company. The management at this time of both concerns was in the same hands. The members of the finance committee of the Insurance Company were all familiar with the condition of the American Company. They realized that the lending of money to the American Company was without any security whatever, other than Insurance Company stock. They knew that the American Company had no revenue with which even to pay interest, and must have realized that the loans would never be paid, and that, substantially, they were encouraging their own stockholders to sell their stock for nothing, to persons who immediately used the stock, by exchanging it for such assets of the Insurance Company as were valuable. All this could easily be held part of a fraudulent conspiracy.

In the letter of the conservation committee to the stockholders it had been suggested that the policy should be to invest the assets of the Insurance Company in good, interest-bearing securities. In making their loans to the American Company, not only was the available cash used, but, in order to make a loan which the American Company needed to pay its notes to defendants, a real estate mortgage for $7,000, payable to the Insurance Company, and drawing interest at 8 per cent., was loaned to the American Company. This campaign for the acquisition of Insurance Company stock, upon which money was borrowed from the Insurance Company, was kept up until all of the notes which had been given by the American Company to the defendants for their stock had been paid with the money borrowed.

The difficulty to be encountered by a court is not in concluding that the natural defendants in this case had entered into a conspiracy and had successfully carried it out, whereby they had acquired the property of other people to the amount of approximately $50,000, but in devising some method by which the persons who have suffered by this conspiracy may be given a remedy. In the suit instituted by the appellant as receiver for the American Company, the Insurance Company is made a party, and is, in substance, charged with participation in the conspiracy. It is charged that the Insurance Company permitted itself to be used in imposing obligations upon the American Company which have resulted in losses. It could, with just as much propriety and force, be said that the American Company permitted itself to be used in looting the treasury of the Insurance Company. Indeed, the treasury of the Insurance Company was the only place in

which there was available money. The activities of the defendants were successfully directed to placing it elsewhere. While it could hardly be said to have reached the American Company, that concern furnished the name in which the transaction was carried on. That which was accomplished is that the natural defendants have acquired from the treasury of the Insurance Company more than $50,000, for which they have parted with value that certainly did not exceed one-third of that amount. The American Company has not profited; but, on the other hand, its losses have been small, because it was substantially without assets at the beginning of the operations.

The receiver of the American Company has instituted a suit in which the Insurance Company is a party, and all of the persons shown to have profited directly by the alleged conspiracy (though not all of the persons who participated in it) are defendants. If there was a conspiracy, no good reason appears why the property that has been fraudulently acquired by the natural defendants should not be recovered at the suit of the receiver, and thereafter applied to restore, as nearly as possible, the conditions as they existed before the conspiracy was entered into.

While the natural defendants did not equally share in the profits, each of them, if there was a conspiracy and he participated, is responsible for the entire amount secured. A recovery of the illegal gains will furnish a fund that will enable the court to go far in restoring the original status. The accomplishment of this end will, undoubtedly, present difficulties. The facts are complex, and if the fraud charged was perpetrated there was a careful effort to give to the transactions the appearance of legality. The skillful use of two corporations, one against the other, to bring about the undoing of both, apparently presents possibilities not fully realized by manipulators of finance or writers of fiction. It seems to open an easy approach to the shadowy domain where low morals and high finance reach a common level.

The actual losers by the transactions under consideration are those of the stockholders of the American who were innocent, and those of the stockholders of the Insurance Company who were duped. It may be that they have been placed in a position where it will be legally difficult to restore to them that which should be theirs. The giving of complete justice may require judicial procedure not lacking elements of novelty. But courts should show as much ingenuity and enterprise in protecting the innocent as is manifested by the unscrupulous in parting them from their property.

[2] The proposition is made that the receiver cannot recover, except where recovery could have been had by the corporation. This may be true as a general proposition, but it is not universally true; and it can very well be insisted that the present case presents a situation where, if further extension of the right of the receiver to recover is required, the extension should be made. It is not, however, true that the receiver stands in the place alone of the corporation. He is, in addition, an instrument of court; he is acting also for the stockholders of the corporation, and the creditors of the corporation. In the instant case, all of the parties affected by the transactions upon which the suit is based

are before the court, and, under proper pleadings, their rights could be adjudicated and protected.

It may be questioned if the proof sustains the allegations with reference to the Insurance Company. If the petition charges it with being a party to the conspiracy, the evidence is insufficient. It is the case, however, that, arising out of the transactions under investigation, the company has acquired certain rights, or has apparently acquired them; and a part of the relief sought, and which can be given against the Insurance Company, is to prevent such an assertion of these rights as would be inequitable. If it be established that sale of the stock to the American Company, and the borrowing of money from the Insurance Company, and the putting up of collateral to secure the loan were all parts of the single fraudulent scheme of conspirators who had charge of the affairs of both corporations, relief, to some extent, at least, could be given.

The stockholders of the Insurance Company, who were induced, as a part of the scheme, to part with their stock, in exchange for stock of the American Company, while not before the court by name, are nevertheless represented by the receiver as stockholders of the American Company, and the receiver is in position to assert and enforce their rights.

Assuming a conspiracy, there would seem to be no reason why the receiver should not be permitted to recover against the natural defendants the money secured by them by their fraudulent transactions, and apply the fund in such a way as to protect, and, as nearly as possible, make whole, the stockholders, primarily of the Insurance Company, but now of the American Company, who were the victims of the fraud. Nor is there any reason why his suit should not be maintained to prevent the Insurance Company from getting a benefit from a transaction essentially illegal, and in which its officers, as officers, participated. While the Insurance Company appears to be more a victim than a conspirator, and has suffered losses which must be considered in an equitable disposition of the case, it has, if the acts complained of were illegally participated in by its officers, acquired claims against the American Company, which, it may be, should not, on account of the circumstances under which they arose, be enforced against that company. It is clearly within the right of the receiver, the equities of the Insurance Company being conserved, to secure a judgment preventing the prosecution of those claims, if, in fact, the officers of the Insurance Company were engaged in a conspiracy against the American Company, and the acts out of which the Insurance Company's claim arises were in furtherance of the conspiracy. Even if it be true that the receiver cannot assert a claim that could not be recovered on by the American Company, it does not follow that at least a part of the relief prayed for in this case should not be decreed.

It is asserted that no recovery can be had by the American Company against the Insurance Company on account of the fact that nothing was done by the Insurance Company until it had become completely under the domination of the American Company. It is true that the

stock which was acquired by the American Company as the result, it is charged, of the scheme to defraud, was used, as was intended, by the conspirators in selecting directors and other officers for the Insurance Company, who immediately proceeded to do that which was necessary in the carrying out of the scheme to secure the money of the Insurance Company. But the circumstances are not such as to preclude the American Company from relief. In fact, one of the parties charged as a conspirator, Manasco, with others of the defendants, had already been in control of the Insurance Company. Neither company was in control of its affairs. Both had apparently fallen into the hands of men who entirely disregarded the rights of the stockholders. Neither company was a conspirator. Both were victims. Any consideration of the matter, or any decision with reference to it, which goes no further than to give force to the mere form which the transactions were made to have, disregards the essential fact that the men who had devised the scheme were utilizing the American Company for obtaining the funds of the Insurance Company, and giving to the Insurance Company as collateral that which furnished no substantial security, but the giving of which jeoparded what little assets the American Company had.

[3] The suggestion is made that the directors of the corporation are not precluded from dealing with the corporation, and that it is not the province of the court to substitute its judgment of values for the judgment of those persons who, by the laws of the corporation, are charged with the management of its affairs. A recovery in this case, if one can be had at all, must be based, not upon the mere sale of property at an excessive price, but upon the theory of a conspiracy to defraud the American Company, the carrying out of which involved the sale of property to the company at a price in excess of its value. If such a conspiracy existed, the effect of it will not be excused or condoned simply by the fact that the conspirators were able to impose upon the directors of the corporation. Much less will its effects be excused in law, when the evidence would justify the conclusion that the directors were completely under the domination of the conspirators, and that they were either operating with them, or were permitting themselves to be used entirely without regard to the interests of the corporation.

If it can be established that the corporation, by fraud of the conspirators, was made to part with value, or was made to assume obligations without a corresponding value being given to it, in other words, was defrauded of that which belonged to it, it is certainly the case that suit could by the corporation be instituted, not alone against the conspirators who had profited by the fraud, but against its officers who had, by their active participation, their connivance, or their criminal neglect, brought about or permitted the fraudulent results.

Such a corporation could also maintain a suit against another corporation to prevent it from enforcing obligations which it had secured as the result of fraudulent transactions between the officers of the two companies. Ordinarily it is not possible to establish that a corporation is a conspirator. But, even when it may not be held

as a conspirator, the circumstances may be such that it may be made to suffer for the illegal acts of its officers; it may be held as if it had participated in such illegal acts. In the instant case, as heretofore suggested, the evidence indicates that the Insurance Company was rather a victim than a conspirator; but, nevertheless it is alleged and it is proved that certain of its officers co-operated with the natural defendants in bringing about results which took away money from the Insurance Company, imposed liabilities upon the American Company, and induced certain of the stockholders of the Insurance Company to part with stock which had some value, in exchange for stock which had none. The Insurance Company may not be held as conspirator, but it may, nevertheless, be compelled to forego any advantage or profit which it acquired by reason of the illegal acts detailed. Any judgment that may be rendered, of course, cannot ignore the rights of the Insurance Company; but these rights may, in a measure, at least, be protected by giving to its original stockholders who were defrauded that which belongs to them, and restoring them, as nearly as possible, to the status which they primarily had. That which has been said is in an effort to maintain that even the American Company would have been in a position to sustain a suit of the kind instituted by its receiver.

Reference has already been made to the contention that recovery cannot be had by, or on behalf of, the corporation simply upon the ground that stock or other property has been sold to it at a price in excess of its value, and that this is true even where the sale is made by the directors or officers of the company, if they did not participate in the act of the directors or other officers by which the purchase was made. There are circumstances under which a sale may be made by officers of the corporation at a price in excess of its value, which would, nevertheless, be sustained. But it could be held the transaction here involved is not of that character. There is evidence of an absence of that quality which is absolutely essential to the maintenance of such a sale—good faith on the part of those who represented the corporation, and on the part of those who sold to the corporation. An officer of the corporation cannot excuse the acquisition from it of something to which he is not entitled, by the mere circumstance that, when the proposition to be acted upon is before the board of directors, he abstains from voting or absents himself. The burden is upon the officer to show that no advantage was taken of his position, and that the transaction was in good faith. It may easily occur that such an officer may sell property to the corporation at a price in excess of its value; but it is essential to the validity of the sale that he, and those representing the corporation, thought it within the value, or thought that some benefit would accrue to the corporation by the purchase. The good faith in the transaction will preserve it. But there must be good faith; there must be no imposition upon the corporation; there must be no taking advantage of the position; there must be no exercise of an improper influence upon the persons charged with the management of the affairs of the corporation.

The application of these principles to the case under consideration would suggest that, if there is any additional evidence to support the transaction, it should be produced. The evidence, while meager in all of its phases, leaves no doubt of the fact that the American Company was not engaged in active business, and that it had very limited assets. The evidence also makes it clear that, while the Insurance Company was not without assets, its affairs had been so conducted by some of the persons who are defendants in this case that it had ceased to do the business for which it had been chartered; that it had large and undetermined liabilities; that it was in process of liquidation. The circumstances were such that any purchaser of its stock must have been a transaction of a very speculative character. Of this, however, there was no doubt. There could be no possible consideration of its assets and liabilities which would have placed the value of its stock at more than $5.61 a share. The market value did not reach this figure, and, so far as the evidence indicates, did not exceed $3 per share. There is no doubt, also, of the fact that the American Company was entirely without funds with which an investment, even of one-fourth the size of that involved, could have been made.

So far as the evidence indicates, its total available assets did not exceed $7,000. With assets to this amount, its directors purchased the stock of a moribund corporation to the amount, according to the price paid, of $46,470. It had to borrow the entire purchase price of the transaction; it paid interest at 8 per cent. to acquire stock that was paying no dividends, and the face value of which was only one-half of the amount which it agreed to pay. In other words, it borrowed $46,470 and paid interest thereon at 8 per cent., in order to secure stock, the face value of which was $23,235, upon which no dividends were being paid, stock in a corporation in process of liquidation, and from which, accepting all of the assets of the corporation at their complete face value, the total amount which could, under any circumstances, be realized would not exceed $25,871.67. In the absence of evidence showing a reason for this transaction, a mere consideration of the purchase itself would justify the conclusion that the parties who sold to the corporation, and the persons who, in charge of the corporation, permitted the transaction to occur, were acting together to defraud the corporation.

The only justification which has been undertaken for the purchase was a clause, inserted in the resolution by which the purchase was authorized, to the effect that it was to the interest of the corporation to secure the control of the Insurance Company. 4,647 shares of stock constituted a little more than 10 per cent. of the stock of the Insurance Company. The same amount of money employed in purchasing stock at its market value would have secured 15,490 shares of stock, still less than a majority, but, at least, having more than three times as much potentiality of control as was acquired by the transaction under question.

It is perhaps true that the American Company, or the persons who were in charge of its affairs, desired to control the Insurance

Company. Indeed, it may be safely said to have been a part of the scheme of those in charge of its affairs to secure or maintain this control; but this control, while it might have carried out the purposes of the schemers, could not have served any proper purpose of the American Company. Certainly the circumstances are such that any court would be authorized to come to the conclusion that the purpose of the directors in purchasing the stock was to accomplish the end which was, in fact, accomplished; that is, to enable conspirators to utilize the name and the limited funds of the American Company to abstract the cash in the treasury of the Insurance Company.

It is not, however, necessary to rely alone upon the convincing language which the transaction speaks. On the very day of the sale the officers of the Insurance Company (one of the defendants acknowledged that the corporation was under his control) announced to the stockholders of the Insurance Company that the directors of the American Company had secured a "large part of the stock" (less than one-eighth, in fact) of the Insurance Company, and would exchange its own shares for shares of the Insurance Company. It would be difficult to come to any conclusion other than that the officers of the Insurance Company were cognizant of the plan already made prior to the sale of the stock to the American Company, to effect the exchanges which were afterwards brought about, and to make loans to the American Company on the stock thus secured. The campaign immediately instituted to secure Insurance Company stock resulted in the acquisition, by the time the notes given as purchase price for the 4,647 shares matured, of a sufficient number of shares to borrow from the Insurance Company enough money to discharge them. The circumstances are such as not even to permit the assumption that the plan of borrowing was conceived after the consummation of the sale. The persons who made the sale, and the directors of the American Company who authorized the purchase, were both familiar with the fact that the American Company would be without funds in the ordinary course of the business as it had been conducted, or as it could be conducted properly, to pay the notes given as the purchase price of the stock when the notes became due. A court would be amply authorized to find that the sellers and the buyers knew that the payment of the purchase price was to be with funds of the Insurance Company.

Good faith upon the part of the officers of the Insurance Company, who were, as Manasco admitted, under his control, can be assumed only by the exercise of a charity which would amount to inexcusable credulity. These persons knew or by the exercise of the slightest degree of that care with which their duty charged them must have known, that the American Company, to whom it was lending money, was already so involved that its personal obligation was entirely without value, and they knew that the transaction which they were authorizing was substantially the utilization of the cash and liquid assets of the company in making payments to some of the stockholders at $3 per share, while the value left to repay the balance of the stock was indefinite, intangible, and subject to deductions, the amount of which could not be fore-

seen. It had just been announced as the policy of the company to invest its funds in good interest-bearing securities pending its liquidation. Among the securities in which the funds had been invested was what was known as the Morris note, secured by real estate, for $7,000. This bore interest at 8 per cent. This note was loaned to the American Company as money, and the note of the American Company, drawing 8 per cent. interest and secured alone by Insurance Company stock, was taken instead. The directors of the Insurance Company, controlled by Manasco, continued to make the loans of its money until an amount had been furnished to the American Company sufficient to pay off what was due to the sellers of the 4,647 shares of stock, and, when that was done, the loans ceased.

[4] Appeals are made to the proposition that fraud must be proved, and not presumed. Fraud must be proved. So must any other fact relied upon for judicial action. That fraud is charged, however, is no reason for suspending the rules of logic in the administration of the law. If facts are established from which an inevitable inference is to be drawn, the conclusion will not be rejected because the conclusion is fraud. Throughout this transaction, these facts stand out strongly: (1) The natural defendants had a limited amount of Insurance Company stock, which had little value; it being stock in a corporation in process of liquidation, subject to unliquidated demands, with little revenue, considerable expense and incurring the costs incident to dissolution. (2) They procured another corporation, of which several of them were officers, a corporation substantially without assets and entirely without business, to purchase their stock at more than three times its value. (3) The money which paid for their stock was procured from the Insurance Company, which had been under their control, and of which several of them were officers, by a device which defrauded at least some of the stockholders of the company. (4) They have the cash of one of the corporations, and upon the other have been imposed obligations which it cannot pay. If, with all the parties before the court, and with the pleadings within the control of the court, and with the facts accessible to the court, the technicalities of the law will not permit a determination of whether the conspiracy existed, as charged, and will not provide a remedy by which, in that event, the property taken may be restored to the persons defrauded, the courts should confess incapacity and give way to a more efficient agency for compelling right.

What has been said must not be taken as the expression of opinion by this court upon the merits of the charge against the natural defendants of a fraudulent conspiracy. The evidence offered by each of these defendants in his behalf has not, for the purposes of this opinion, been considered. It may be that a trial court, even if it found the existence of the conspiracy, would be warranted in holding that some of the defendants were not parties to it. The effort has been to show that, if the allegations of the petition are true, relief could have been, and should have been, extended, and to show that the evidence introduced by the plaintiff was sufficient to sustain these allegations. The memorandum opinion of the trial judge indicates that the

case was disposed of on a conception of the jurisdiction and authority of a court of equity in cases of the kind under consideration that we believe too narrow. The evidence strongly suggests a conspiracy involving breach of trust, requiring rescission and cancellation of contracts and adjustment of rights between defrauded corporations, and the determination and protection of the rights of defrauded stockholders as against the other stockholders and officers of the corporations. No proceeding at law could furnish adequate relief.

The judgment is reversed, and the cause is remanded for further proceedings not inconsistent herewith.

Reversed.

WALKER, Circuit Judge (dissenting). The object of this suit by the receiver of the American Mortgage & Loan Company (which will be called the Mortgage Company) is to recover the amount of loss alleged to have been sustained by that company as a result of its purchase of 4,647 shares of the stock of the Southern States Fire Insurance Company (which will be called the Insurance Company) and pledging that stock as security for money borrowed to pay the price of the stock bought, which was alleged to be greatly excessive. The stock in question belonged to the seven individual defendants, each of them owning part of it, three of them being directors of the purchasing company. Together they controlled the affairs of the corporation, the stock of which was sold. The evidence was to the effect that the Mortgage Company, in buying the stock, acted through representatives who had no personal interest in the stock bought, and who, so far as appears from the evidence, were not subjected to any improper influence exerted in behalf of any seller of the stock. A finding that the purchase of the stock was to any extent the result of a breach of a fiduciary obligation owing by a seller to the purchasing company would be pure surmise or conjecture, unsupported by evidence. The evidence makes it perfectly plain that the purchase of the stock by the Mortgage Company was a step in the execution of a scheme of its own to acquire a controlling interest in the stock of the Insurance Company.

There was an absence of evidence indicating that any one interested as a seller of stock was in any way responsible for the Mortgage Company's adoption and prosecution of the scheme to get control of the Insurance Company. The money of the Insurance Company which was used in paying debts made by the Mortgage Company in its purchase of stock was obtained after the latter had, by the election of a board of directors chosen by it, come into control of the affairs of the former. It was not made to appear that it was on the initiative of any one other than itself, acting by representatives having no personal interest in the Insurance Company stock bought, that the Mortgage Company became the debtor of the Insurance Company, a corporation then under the debtor's control, and pledged shares of the stock of that corporation as collateral to secure the indebtedness incurred. Nor was it made to appear that the individual defendants, or any of them, had anything whatever to do with planning or carrying out the transactions by which that result was accomplished. Though the individual

defendants co-operated with the Mortgage Company in furthering the latter's scheme of acquiring a controlling interest in the stock of the Insurance Company, this would not make them liable to the Mortgage Company for the losses the latter sustained in carrying out a venture of its own; the Mortgage Company acting throughout on its own judgment and with full knowledge of the facts. It was not even alleged that the Mortgage Company was induced or influenced to make any purchase of Insurance Company stock by any fraudulent misrepresentation in regard to it.

Acting by its own chosen representatives, who, so far as appears from any evidence adduced, had no adverse personal interest and were subjected to no improper influence in behalf of any seller, the Mortgage Company bought Insurance Company stock and in doing so made debts, secured by all its available assets, and was swamped as a result of the assets turning out to be worth less than the debts they secured. The effort is to make the defendants responsible for losses resulting to the Mortgage Company from the failure of a business venture of its own. The receiver of the Mortgage Company does not represent strangers to it who may have been prejudicially affected by the transactions in question. As receiver he is not entitled to charge the defendants with the consequences of the voluntary and uninfluenced conduct of the Mortgage Company itself. In the opinion of the writer what the record discloses is wholly insufficient to warrant a reversal of the decree dismissing the bill. It cannot properly be said of the evidence that it clearly proved the material averments of the bill. Furthermore, if there was a conspiracy to effect a sale of the Insurance Company stock owned by the group of stockholders of that company which controlled it, and to use that company's money in paying the price at which that stock was sold, the evidence which showed the existence of such conspiracy also showed that the Mortgage Company, acting by representatives having no personal interest in such stock, and who, so far as appeared, were subjected to no improper influence in behalf of any seller, but influenced by a desire to acquire control of the Insurance Company, made itself a party to that conspiracy, and, after it was in control of the Insurance Company through a board of directors of its choice, got from the Insurance Company the money required to pay the debts made in the purchase of the stock by borrowing it from the Insurance Company on the Mortgage Company's notes secured by the Insurance Company stock as collateral. The evidence indicated that Manasco and those associated with him in maintaining control of the Insurance Company were enabled to get more for their combined holdings of Insurance Company stock than the same amount of such stock held by others would bring in the market, because the acquisition of their stock and the securing of their co-operation enabled the purchaser to get in control of the Insurance Company. This was the result of the sale and of the co-operation of the sellers in putting the buyer in control of the Insurance Company, though the sellers had less than a majority of the Insurance Company stock.

The situation, then, is that the receiver of the assets of one conspirator is suing the other conspirators for losses sustained by the former in

carrying out the conspiracy. The receiver has no better right to main-tain the suit than the Mortgage Company would have had if the re-ceiver had not been appointed. One wrongdoer cannot maintain a suit against others who co-operated with him in the wrongful conduct com-plained of. Whatever loss the Mortgage Company sustained was a result of its own voluntary action in entering upon and carrying out a scheme to get control of the Insurance Company and in thereby in-curring an indebtedness greater in amount than the value which the assets it pledged turned out to possess. The pledging of the Insurance Company stock for money borrowed from that company by the Mort-gage Company was the act of the latter when it was in no way control-led by the individual defendants, or any of them.