J. D. WHEELER, Receiver of Texas Mutual Insurance Company, Appellant,

v.

AMERICAN NATIONAL BANK OF BEAUMONT et al., Appellees.

No. 6076.

Court of Civil Appeals of Texas.

Beaumont.

July 14, 1960.

Rehearing Denied Sept. 14, 1960.

Tatum, Camp & Ball, Beaumont, Rudy Rice and Josh H. Groce, San Antonio, for appellant.

Orgain, Bell & Tucker, Strong, Moore, Pipkin, Strong & Nelson, Marcus, Weller & Evans, Beaumont, for appellees.

HIGHTOWER, Justice.

This is an appeal from an order of a district court of Jefferson County sustaining motions in the nature of general demurrers and dismissing the cause of action.

The suit was originally filed by way of cross action by J. D. Wheeler in his capacity as Receiver for Texas Mutual Insurance Company of Texas. On the basis, principally, of an alleged conspiracy to defraud Texas Mutual, its creditors, policyholders and the public, it sought to recover $1,044,812.01 alleged actual damages and $1,000,000 as penal damages against:

Paul R. Lowry, of Beaumont, Texas, one of the original organizers of Texas Mutual and who was its President and a member of the Board of Directors from its organization in May, 1949 until September 23, 1952; Leslie D. Lowry, of Beaumont, Texas, brother of Paul R. Lowry, who was one of the original organizers of Texas Mutual and who was its Secretary-Treasurer or President and member of its Board of Directors throughout its entire existence; D. Hubert O'Fiel, of Beaumont, Texas, individually and as President of Rainbow Realty Company, a Delaware corporation, who was attorney for Texas Mutual, one of its organizers and Vice-President and Director of Texas Mutual from September 30, 1951 until it was placed in receivership on February 13, 1953; Tom Taylor, of Bryan, Brazos County, Texas, a Director of Texas Mutual from June 27, 1950 until September 23, 1952; The First National Bank of Beaumont, a national banking corporation; The American National Bank of Beaumont, a national banking corporation; Carl A. Kohler, of Beaumont, Texas, a Director of Texas Mutual from June 27, 1950 until such company was placed in receivership on February 13, 1953; V. C. Thompson, of San Antonio, Texas, at all pertinent times Examiner for the Board of Insurance Commissioners of the State of Texas; Sampson Carr, of Beaumont, Texas, an employee of the Lowrys at all pertinent times, and approximately ten other Cross and/or Third-Party Defendants to the Receiver's Cross Action, some of whom will be referred to hereinafter.

The pleas of privilege of Tom Taylor and others, to be sued in the counties of their respective residences, having been sustained, the court next ordered a severance and separate trial of the Receiver's cross action against the five last named parties, i. e., The American National Bank, The First National Bank, Kohler, Thompson and Carr, "* * * in furtherance of convenience, and in order to avoid prejudice * * *." The Receiver's cross action in the original action was then renumbered and filed as his pleadings in the severed cause which pleading will be referred to as Receiver's complaint.

Next came on to be heard the pleas in abatement and motions to dismiss filed by The American National Bank, The First National Bank and Thompson to the Receiver's complaint. These motions and pleas were all sustained by the trial court on the ground that the complaint failed to

state a cause of action in the Receiver in any capacity in which he sued. The other two defendants, Kohler and Carr, were likewise dismissed from the suit on the same ground, although, as noted by the court in its order, they had entered no pleas in abatement or motions to dismiss. Having declined to further amend, it is from such order of dismissal that the Receiver appeals.

The substance and general theme of the Receiver's complaint unequivocally depicts a common scheme and design of the Lowry brothers, Paul and Leslie, and others in control of Texas Mutual, to fraudulently organize the corporation by means of false representations on fictitious capital and to likewise keep it operating throughout its existence of over three and one-half years as a means of defrauding the corporation, its creditors, and policyholders. Unquestionably the facts alleged in the complaint against them show the appellees herein to have actively and materially aided the Lowrys in falsely representing the capital assets of Texas Mutual to the Board of Insurance Commissioners of the State of Texas, hereinafter called the Board, thus aiding the Lowrys in their false representations to the public.

Primarily we are concerned with the problem of whether the misrepresentation phase of complaint alleges the involvement of the appellees with the Lowrys, et al., in a conspiracy that actually damaged Texas Mutual, for which damages the Receiver may sue, as contra-distinguished from a conspiracy which may have damaged only the corporation's creditors and for which damage they alone may sue. The complaint is lengthy, consisting of more than 160 pages, and only such parts of it as we deem essential to a clear understanding of the questions involved will be set out. The following paragraphs, or parts thereof, of the complaint are as therein numbered for reference hereinafter:

\* \* \* \* \* \*

19.

"There are more than 14,000 parties of Texas Mutual who have claims approved against Texas Mutual in a total sum of $1,243,319.92 as of December 31, 1954. The reasonable value of the assets available to your Receiver with which to pay these debts is $233,507.91. The reasonable future costs of administering the receivership estate of Texas Mutual is $35,000.00. Thus there exists a deficit of $1,044,812.01, which figure represents the losses suffered by Texas Mutual and its creditors, policyholders and claimants as a proximate result of the wrongful acts of the cross-defendants and the third-party defendants as herein pleaded."

\* \* \* \* \* \*

27.—Nature of Cross Action

"The Receiver, J. D. Wheeler, brings this Cross-Action on behalf of and as a representative of Texas Mutual and of the policyholders, claimants and creditors of Texas Mutual Insurance Company for the losses suffered and obligations incurred by such parties and directly and proximately caused by various wrongful, fraudulent, and illegal conduct of the Cross-Defendants and Third-Party Defendants in connection with the organization and operation of Texas Mutual Insurance Company between the dates of May 12, 1949, and February 13, 1953. As will be set forth in detail later in this petition, such wrongful acts include the following:

"A. A conspiracy to defraud the public and the parties represented by said Receiver conceived by and/or executed by, and/or agreed to, and/or embraced by, and/or assisted, promoted, and furthered by Paul R. Lowry, Leslie D. Lowry, \* \* D. Hubert O'Fiel, \* \* \* Carl A. Kohler, Sampson Carr, \* \* \* Tom Taylor, V. C. Thompson, \* \* \* Elizabeth Boykin Lowry, in her individual capacity and as executrix of the Estate of Burwell Boykin, Jr., deceased, \* \* \* First National Bank of Beaumont, and The American National Bank of Beaumont.

"B. Wrongful abstractions, or embezzlements, or conversions, or expenditures of monies held in trust, or payment of illegal

dividends, and similar isolated and individual wrongful acts performed by or assisted by Paul R. Lowry, Leslie D. Lowry, D. Hubert O'Fiel, * * * V. C. Thompson, * * * The First National Bank of Beaumont, and The American National Bank of Beaumont for which all of such parties and their bondsmen are jointly and severally liable.

"All of such wrongful, illegal, willful, fraudulent, or negligent acts on the part of each Cross-Defendant and Third-Party Defendant will be set forth in detail in the portions of the petition hereinafter."

\* \* \* \* \* \*

28.

"In May of 1949, Leslie D. Lowry and his brother, Paul R. Lowry, were operating an insurance sales agency in Beaumont, Jefferson County, Texas, as a partnership under the name of Leslie Lowry and Company. The Lowrys wanted to organize and operate an insurance company in Texas, and they determined to attempt to do this by organizing a company without complying with requirements of the law. It was not their intention to organize a company in good faith, but they intended to simulate the capital requirements of a casualty insurance company and to obtain by fraud and concealment a charter and licenses to do business in Texas. It was their purpose and intention to operate this company with a simulated capital structure and to sell policies of insurance under the licenses thus obtained to an unsuspecting public who would not be aware of the inability of the company to pay the losses incurred upon its policies. They intended that the public at large, and particularly prospective policyholders and creditors of their company, would rely upon the license granted to their company as evidence and proof that their company had met all of the requirements demanded of insurance companies by the State of Texas and was well able to pay *and* losses that might be covered by such policies and any debts that might be incurred by the company. They intend-

ed to defraud the public generally and the policyholders of the company in particular by collecting premiums from the policyholders and incurring debts under the false pretense of having sufficient capital and surplus to pay the losses which would occur on such policies and the debts which would be incurred. They intended to appoint Leslie Lowry and Company to be sales agent for the company to channel as much business through such agency as possible, and to pay to such agency as commission a percentage of the premiums received. They did not care whether or not the company had any money to pay the policyholders or creditors for their losses and debts. They wanted merely to realize for themselves and for whoever would join them in this conspiracy as personal profit out of the collection of premiums by the company. In this determination and purpose they were joined by David E. O'Fiel and D. Hubert O'Fiel and the four of them with other conspired, devised, and effected the fraud and scheme by which their purpose was accomplished."

The following acts of specific misconduct alleged against the appellees are taken generally as summarized in the Receiver's first brief:

"Appellee, First National, knowingly made false representations to the Board to aid the Lowrys and D. Hubert O'Fiel, the original incorporators, to obtain a charter and the original certificate of authority of Texas Mutual. To obtain the charter and original certificate of authority of Texas Mutual to begin doing an insurance business it was necessary that Texas Mutual have cash or invested assets of not less than $20,000 as a reserve fund to guarantee payment of creditors and losses to policyholders. Instead of the Lowrys and D. Hubert O'Fiel contributing such sum to Texas Mutual, as required by law, they borrowed $10,000 from David E. O'Fiel and the Lowrys temporarily loaned another $10,000 to Texas Mutual to make up the required $20,000. This $20,000 was deposited in First National in the name of Texas Mutual. The bank

as well as the Lowrys and O'Fiel knew that this was not in fact money belonging to Texas Mutual. On July 9, 1949, the Lowrys made an affidavit to the Board of Insurance Commissioners that Texas Mutual had on deposit in First National the sum of $20,000 in cash and all of such money was the bona fide property of Texas Mutual subject to its check and disposal and that no other person, firm, corporation or association had any interest or claim to such funds. A similar false affidavit was obtained from First National by the Lowrys which further stated that it was made for the purpose of assisting Texas Mutual in securing a charter and permit to do business. These affidavits were submitted to the Board and on July 11, 1949, the Board, relying upon such affidavits, granted Texas Mutual a charter. Within five days thereafter, the entire $20,000 was withdrawn from the account of Texas Mutual and repaid to the persons who had temporarily furnished such money to Texas Mutual in order that it could falsely represent that such funds belonged to Texas Mutual. When First National made the affidavit, the bank knew that this $20,000 was all borrowed money which would be immediately repaid and that the affidavit was false.

"The appellee First National also knowingly aided the officers of Texas Mutual in falsifying the company's annual statement of December 31, 1950 in the following manner:

"On December 27, 1950, Paul and Leslie Lowry, on behalf of Texas Mutual, borrowed $20,000 from First National and caused it to be deposited to the credit of Texas Mutual in a special account. This loan was made on the basis of a ten-day note at 2% dated December 27, 1950, due January 6, 1951. At the time it made the loan, First National did not intend that the proceeds of such loan should be the bona fide property of Texas Mutual or that such proceeds of such loan should be subject of Texas Mutual's control. The bank intended only that this entire transaction should be a sham transaction of such a nature that without the banks subjecting itself to any risk, Texas Mutual could use it as an apparent asset and the bank could certify that on December 31, 1950, the sum of $20,000 was on deposit in such bank to the credit of Texas Mutual. At the time this loan was made, Howard W. Gardner, the vice president of the bank who arranged such loan with Paul and Leslie Lowry, issued instructions to the bank employees that no checks were to be paid on such special account without the personal approval of either himself or Mr. C. W. Durden, another officer of the bank. This deposit of $20,000 remained to the credit of Texas Mutual until January 6, 1951, and, in accordance with the agreement between the banks and the Lowrys, the bank then took this $20,000 and paid it to itself and cancelled the Texas Mutual's $20,000 note.

"The appellee American National also knowingly aided the officers of Texas Mutual in falsifying the company's annual statement as of December 31, 1950. This was done in a similar manner to that in which the First National aided in falsifying such annual statement. On December 28, 1950, Leslie Lowry, on behalf of Texas Mutual, executed a promissory note in the sum of $50,000 to appellee American National. This note bore 3% interest and was due and payable on January 7th, 1951, only nine days later. The proceeds of this loan were deposited in American National to the credit of Texas Mutual as a special deposit and the bank issued to Texas Mutual a certificate of deposit therefor. To comply with the terms and conditions of the loan that the deposit could not be withdrawn by Texas Mutual, and that the proceeds of such loan would act as security for said loan, Texas Mutual assigned the certificate of deposit to the bank and the bank held such certificate as security for the loan. American National did not intend that the proceeds of this loan should be the bona fide property of Texas Mutual or that Texas Mutual should ever have any control over such proceeds. The bank knowingly joined in this bogus paper transaction so that Texas Mu-

tual could claim a cash asset of $50,000 on December 31, 1950, in its annual statement, and so that the bank could certify in effect that this fictitious $50,000 was an asset of Texas Mutual. On January 6, 1951, the bank cancelled the note by charging the amount of the certificate of deposit against it, thus completing the cycle represented by this sham paper transaction.

"Appellee First National further knowingly aided the officers of Texas Mutual in falsifying the annual statement of Texas Mutual as of December 31, 1950, in the following manner: In order to further bolster the apparent cash assets of Texas Mutual, Leslie Lowry drew a customer's draft in the amount of $50,000 against Tom Taylor, a director of Texas Mutual. On December 30, 1950, Leslie Lowry delivered this draft to First National with instructions to such bank to collect the amount thereof from Tom Taylor. The bank immediately credited Texas Mutual's account with the sum of $50,000 although the bank received such draft only 'for collection'. It then sent this draft to First National Bank of Bryan, Texas, so that it could be presented to Taylor. On January 8, 1951, the Bryan Bank returned the draft to First National unpresented and unpaid reporting that it had been unable to locate Taylor to present the draft to him for his acceptance and payment. First National then debited Texas Mutual's account with $50,000, thus cancelling out the previous credit. At the time First National gave Texas Mutual credit for the $50,000, when the draft drawn by Leslie Lowry was delivered to them, the bank was well aware that the sum of $50,000 thus credited to Texas Mutual's account on December 30, 1950, did not represent actual funds then owned by Texas Mutual nor did this sum represent actual funds in any amount whatsoever, actually deposited with said bank to the credit of Texas Mutual.

"In the company's annual statement as of December 31, 1950, the officers of Texas Mutual falsified such annual statement by representing that the proceeds of the $20,-000 loan from First National, the $50,000 loan from American National, and the $50,-000 deposit of the collection item on the Taylor draft in First National, as cash assets on deposit in such banks without showing the offsetting liabilities.

"In addition to aiding the officers of Texas Mutual in falsifying the company's annual statement, the appellee banks made false representations to the Board's examiner Thompson, and by virtue of such false representations knowingly aided the officers of the company in creating these false assets, and likewise knowingly aided Thompson in making the false examination report.

"In February, 1951, the Board sent appellee Thompson to Beaumont to make an examination of the affairs of Texas Mutual, which examination was to be made as of December 31, 1950, the date of the annual statement. Under the authority of Art. 4690, R.C.S., now Art. 1.15, Insurance Code, V.A.T.S., and Art. 4691, R.C.S., now 1.19 of the Code, Thompson made requests to each of the appellee banks as to the true status of Texas Mutual's transactions with said banks as of December 31, 1950. In addition to making the false and fictitious loans, in answer to the inquiry of Thompson, both banks knowingly and falsely certified that the money on deposit in the account of Texas Mutual was subject to the company's checks and withdrawals; that there were no certificates of deposit outstanding; and that on December 31, 1950, Texas Mutual was not indebted, either directly or contingently to said institutions for borrowed money, discounted notes, or under any other form of agreement.

"Based upon these false representations Texas Mutual was granted a renewal of its certificate of authority and was permitted to continue to operate although the company was insolvent.

"Just one year later American National also knowingly aided the officers of Texas Mutual in falsifying the company's annual statement as of December 31, 1951. This

was done in transactions similar to those in December of 1950 above described. On December 20, 1951, Paul and Leslie Lowry made an agreement with American National that said bank would lend to Texas Mutual $25,000 over the end of the year provided that such money would be placed in a special account which would be assigned to the bank as security for the loan, or otherwise maintained under the absolute control of the bank. The bank did not intend that this money should be the bona fide property of Texas Mutual and subject to its control and it was agreed that Texas Mutual would not and could not withdraw such funds. It intended only that this transaction should be another sham transaction and the funds would be used only for the liquidation of the loan. Pursuant to these arrangements with the bank, Paul and Leslie Lowry, on December 27, 1951, caused Texas Mutual to issue its promissory note in the sum of $25,000 payable to American National bearing 3% interest and due January 3, 1952, which was only six days later. On January 2, 1952, Texas Mutual's check in the sum of $25,000 payable to American National was used to repay said loan.

"In Texas Mutual's annual statement as of December 31, 1951, the company carried the proceeds of the $25,000 loan as cash assets in the form of a deposit in the American National, and did not show the offsetting liability. By virtue of such acts, American National knowingly aided the officers of the company in falsifying the company's annual statement. Based upon these and other false representations in the annual statement, the Board of Insurance Commissioners was induced to issue a certificate of authority to Texas Mutual to continue to do business for the year 1952.

"Appellee First National further knowingly aided the officers of Texas Mutual in obtaining a permit from the State of Louisiana on behalf of Texas Mutual for such company to do business in the State of Louisiana, by making a $20,000 loan and representing to the Board of Insurance Commissioners of the State of Texas and the State of Louisiana that the proceeds of such loan represented cash assets on deposit, without disclosing that such claimed assets were the proceeds of a loan with an offsetting liability.

"The certificates of authority issued to Texas Mutual as a result of the false annual statements as of December 31, 1950, and 1951, were submitted to the Commissions of the other states in which Texas Mutual at the time was doing business, in order that Texas Mutual could obtain renewal of its certificates of authority to do business in all these states.

"Appellee Kohler, a director of the corporation from June 27, 1950, until such company was placed in receivership on February 13, 1953, as aforesaid, knowingly made false and fraudulent appraisals of the company's home office building to the extent of hundreds of thousands of dollars. He knowingly made false appraisals of other assets of the company to the extent of many thousands of dollars.

"Appellee Carr also knowingly made false and fraudulent appraisals of the company's home office building to the extent of hundreds of thousands of dollars.

"Appellee Thompson, as above indicated in our reference to the acts charged against the appellee banks, as an official examiner for the Board knowingly and intentionally made a false examination and report of the affairs of Texas Mutual and accepted what amounted to bribes for doing so."

A concluding and very pertinent paragraph of the complaint is the following:

227.

"Receiver alleges that all of the wrongful, fraudulent, unlawful and dishonest acts performed and done by each and every person and corporation as specifically detailed hereinbefore, were done in furtherance of a common agreement, scheme and conspiracy existing either actively or tacitly between all of such persons and corporations with the exception of Maryland

Casualty Company. This common purpose, design and conspiracy was intended to deceive, defraud, cheat and swindle innocent policyholders, claimants, and creditors of Texas Mutual Insurance Company as hereinbefore alleged. Each and every policy of insurance sold by Texas Mutual Insurance Company, its officers and agents, falsely represented that the said company was a sound and solvent corporation and well able to pay and would pay the losses and claims of such policyholders which might be suffered under such policies. Likewise the conspirators proposed to defraud and swindle all other creditors of Texas Mutual by representing to the public at large and to prospective creditors in particular that Texas Mutual was a safe, sound and solvent corporation which was well able to pay its debts. Through the combined efforts of all of the persons hereinbefore named as cross-defendants and third-party defendants, it was made possible for them to effectuate their purpose by using the facilities of Texas Mutual to offer its worthless policies for sale, and to provide a cloak of legal authority under which they could carry out this fraudulent purpose. Each and every one of such persons, firms and corporations entered into, aided, abetted, furthered, and gave assistance to this conspiracy. It was the duty of all of the officers and agents of Texas Mutual who had knowledge of the true financial condition of such company or who in the exercise of reasonable diligence should have known the true financial condition of such company, to reveal this condition openly and honestly at each time a policy of insurance was sold or a debt was incurred by the company. In violation of this duty owed to its policyholders and creditors and prospective policyholders and creditors, the officers and agents of Texas Mutual, hereinbefore named, who either had knowledge of its financial condition or are charged with such knowledge never at any time volunteered the information that such company was at all times hopelessly insolvent, but at all times such persons concealed and covered up this important fact.

All of the acts done and the representations made by the conspirators, hereinbefore specifically detailed, did in fact effectuate and accomplish and carry out the evil purpose, design and intent of the conspiracy. Each and every creditor of the company allowed his debt to be incurred by relying upon the false representations made to him that Texas Mutual was a safe and solvent company and well able to pay its debts and losses. All of the misrepresentations made by the officers and agents of Texas Mutual were made either directly to the policyholders and creditors who relied thereon or were made directly to the class of persons to which such policyholders and creditors belonged, with the intent that such representations should be relied on by those particular policyholders and creditors or by persons within the class to which the said misrepresentations were made. These misrepresentations were in fact relied on either by the policyholders and creditors to whom they were directly made or by policyholders and creditors within the class to which such representations were made. Such policyholders and creditors were thus defrauded by such false representations and did suffer a collective loss in the amount of $1,044,812.01, as a direct and proximate result of the acts done and the misrepresentations made in furtherance and pursuance of the conspiracy."

As grounds for recovery against the appellees First National Bank and American National Bank, and alternatively to those alleged in sub-paragraphs A and B of paragraph 27 of the complaint, supra, the complaint alleged that by virtue of the fraudulent conduct, acts, representations, and concealments of appellees First National and American National, pertaining to the first $20,000 transaction between Texas Mutual and First National; the second $20,000 transaction between Texas Mutual and First National; the $25,000 transaction between Texas Mutual and American National; the $50,000 transaction between American National and Texas Mutual and the $50,000 Taylor draft transaction, these

appellees are estopped to deny that Texas Mutual was the owner of these sums which the banks had so represented and for which amounts appellant is entitled to recover under the doctrine of equitable estoppel.

■ As a preliminary statement it may be said that those of the appellees who have filed briefs (American National, First National and V. C. Thompson) contend that the complaint shows upon its face that the recovery sought therein against them, insofar as the conspiracy count is concerned, is not for assets of any nature belonging to the corporation for which the Receiver is legally entitled to sue. To the contrary they contend that the complaint shows upon its face that the recovery sought is for damages personal to the policyholders and other creditors of Texas Mutual, and for which damages they alone may sue. Such contentions are in line with the general rule that a receiver takes only the rights and may bring only such actions as the Corporation could have brought in recovering the assets of the Corporation. The exception to this rule is stated in 3 Hildebrand, The Law of Texas Corporations 507:

"It is true the general rule is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself. There is, however, a well defined exception to such rule. A receiver of such a corporation acts in a dual capacity. He is trustee both for the stockholders and creditors. As trustee for the creditors, he is permitted to maintain and defend actions involving acts done in fraud of creditors, even though the corporation would not be permitted to do so."

Stated otherwise there are instances where a corporation itself would not be permitted to sue for recovery of a true corporate asset because of its own fraudulent conduct in connection with the loss of the same. However, the receiver would not be so estopped. In such instances he may disaffirm or repudiate the fraudulent acts of the corporate officers and seek recovery of such assets for the benefit of the corporation and creditors. This is the rule in Texas. See 75 C.J.S. Receivers § 326, p. 1001.

■ Now from a studied examination of the entire complaint, with special emphasis on the paragraphs thereof as above-numbered and set out, it appears certain that the recovery sought therein of the appellees by virtue of a conspiracy is not for assets of Texas Mutual. To the contrary paragraphs 19, 28, and 227, supra, of the complaint are implicit to the effect that recovery is sought in the exact amount of, and by reason of the personal losses to the creditors of Texas Mutual as a direct result of a conspiracy to "deceive, defraud, cheat and swindle innocent policyholders, claimants and creditors of Texas Mutual Insurance Company as hereinbefore alleged." This being so, the law is well established that the Receiver is not the proper party to bring the action. Thomason v. Miller, Tex.Civ.App., 4 S.W.2d 668; Seale v. Baker, 70 Tex. 283, 7 S.W. 742.

The Receiver has filed three separate briefs, viz., original brief, reply brief and reply to reply briefs. We believe our construction placed upon the complaint to the effect stated is the same construction placed upon it by the Receiver and urged as the basis for his right to recover in the court below by reasons of the following contentions quoted from his original brief, pages 4, 13, 26 and 40, respectively:

■ (P. 4) "This action is sought to recover over a million dollars which has been lost by innocent victims"; (p. 13) "Since the basis of the Receiver's Complaint is that the appellees joined, aided, abetted, furthered and made possible a conspiracy to defraud the claimants, creditors and policyholders in the operation of an insolvent insurance company * * *"; (p. 26) "Furthermore said misrepresentations were made in financial statements distributed directly to the public, * * * all of which were intended to and did mis-

lead and induce the public to purchase worthless insurance policies from Texas Mutual"; (p. 40) "We therefore respectfully submit that fraudulent representations made to the Board for the purpose of obtaining and/or retaining the license to do an insurance business in Texas, and to write non-assessable policies under the above authorities are just as binding upon the representator, and as actionable on behalf of the insurance-buying public, as if the representations had been made directly to the insurance buying public and that the banks are equally liable in that they knowingly aided, abetted, and furthered the gigantic conspiracy." Of course, the Receiver is not precluded by such contentions in his original brief from asserting other theories as a basis for a right to recover in himself. Other contentions urged upon us are, in substance, that in view of the fact that the allegations of the complaint show a continuous and methodical system of conversions and misappropriations by the Lowrys, et al., since the inception of Texas Mutual to its demise, that the misrepresentations enabled the Lowrys, et al., to continue the existence of the insolvent company thereby incurring debts against it which could not otherwise have been incurred and enabled them to convert and misappropriate its assets, thus damaging Texas Mutual itself. Somewhat in this connection we agree with the Receiver that simply because the total recovery sought in a proceeding of this nature happens to exactly correspond with the total amount of debts due by a corporation does not preclude a showing that the amount sought to be recovered actually is for damages or loss to the corporation rather than for damages personal to its creditors. That this has been held to be so, see Jackson v. Stallings, 169 Ga. 176, 149 S.E. 902. However, as heretofore stated, we do not believe the framework of this complaint admits of such construction.

██ Be that as it may, the gravamen of a conspiracy is not the conspiracy itself but is the civil wrong done under the conspiracy which results in damage to the plaintiff. The conspiracy itself may be of no consequence except as bearing upon the rule of evidence or the person's liability. 15 C.J.S. Conspiracy § 21, p. 1031; 11 Am.Jur., pp. 577–578. This being so, the alleged acts of the appellees in conspiring with the Lowrys, et al., to misrepresent the financial condition of Texas Mutual to the public and to the Board of Insurance thus prolonging its existence was not actionable in the Receiver, no damages having resulted to Texas Mutual as a result thereof. We quote only from the case of Patterson v. Franklin, 176 Pa. 612, 35 A. 205, because of the succinct lucidity of its holding, but we are of the opinion that our view that only the creditors (policyholders, etc.) and not Texas Mutual were damaged by the misrepresentations is supported by the weight of authority in the United States.

The Patterson case, by the Supreme Court of Pennsylvania, involved an action on behalf of the corporation wherein recovery was sought by its assignee, whose status was the same as a receiver, against the defendant incorporators on behalf of the corporation because they had falsely certified that the corporation had $50,000 paid in capital. The corporation was granted its charter and enabled to commence its business because of the reliance by a State official upon this false certification. The court held there was no liability to the defunct corporation, because it was not damaged by the false representation in the certificate, saying:

"This statement, made and sworn to in the usual manner, is now alleged to have been false, in so far as it asserted the payment of $50,000 to the treasurer of the corporation, and it is asserted that not one dollar in cash was so paid. It is certain that after a short business career the corporation, being unable to pay its debts, made an assignment for the benefit of creditors. The plaintiff in this action is the assignee. The defendants are the corporators by whom the alleged false certifi-

cate was signed. The right to recover is rested on the alleged fraud committed by means of the false representation contained in the certificate. Now, the assignee succeeds to all the rights of action which his assignor had at the time of the assignment, whether matured or not. He can sue, therefore, for unpaid subscriptions to the capital stock, and for any debt due by a stockholder, as well as for debts due the corporation from others. He recovers because the corporation could recover, and all such demands are assets of the corporation, in his hands. *It is important, therefore, to inquire what cause of complaint the corporation has against the defendants because of the alleged fraud. How did the corporation suffer because of it?* If the certificate was a falsehood in the particular alleged, the executive department of the state government was cheated into issuing letters patent to persons not entitled to them. The state could complain, and, upon a showing of the fraud, cancel the letters patent. The business public could complain, and any person induced to credit the corporation because of the falsehood, and finding himself a loser, might proceed for the recovery of his individual loss in an appropriate form of action. *But how can the corporation complain?* The fraud was perpetrated for its benefit. *It was a gainer, not a loser, because of it.* It was given a considerable credit by the statement to which, as it is alleged, it had no claim whatever. Let it be conceded that this statement was absolutely false, *still no one could legally complain of it who was not injured by it.* If A. falsely represents to B. that C. is worth a certain sum of money, and is therefore worthy of credit; B. if misled, and a loser because of the fraud upon him, might justly complain; but C., who benefited by the fraud, could have no just complaint against A., growing out of his false representation to B. So in the case before us. *The lie, if lie there was in the certificate, was in the interest of the corporation. It gave it a credit to which it was not entitled.*

*It enabled it to contract debts which it could not pay. Those who suffered are the parties to complain, not these who benefited by means of the fraud.* The corporation had no right of action against the defendants, growing out of the false statement in the certificate, and the plaintiff, its assignee, has none." [Emphasis added by Judge]. 35 A. 205, at page 206. For Texas cases to the same effect see Thomason v. Miller and Seale v. Baker, supra, and see Michelsen v. Penney, D.C., 10 F.Supp. 537; Kimmich v. Potter, 2 Cir., 112 F.2d 135; Prescott v. Haughey, C.C., 65 F. 653; Kinter v. Connolly, 233 Pa. 5, 81 A. 905; Houston v. Thornton, 122 N.C. 365, 29 S.E. 827; Killen v. State Bank, 106 Wis. 546, 82 N. W. 536; Blumer v. Ulmer, Miss., 44 So. 161; Hines v. Wilson, 164 Ga. 888, 139 S. E. 802; Deeds v. Gilmer, 162 Va. 157, 174 S.E. 37; New Era Motors, Inc. v. Burst, 8 Cir., 53 F.2d 41.

■ In support of his contentions that the misrepresentations of the appellees were wrongs which damaged Texas Mutual itself and therefore actionable by the Receiver in behalf of Texas Mutual and/or its creditors, the Receiver cited McTamany v. Day et al., 23 Idaho 95, 128 P. 563; Douglass v. Dawson, 190 N.C. 458, 130 S. E. 195; Sain v. Love, 207 N.C. 588, 178 S.E. 98; Gores v. Field, 109 Wis. 408, 84 N.W. 867, 85 N.W. 411. Most of these cases are in accord with what we have already stated to the effect that a receiver may recover only for losses or damages suffered by the estate which he represents, or conversely that the creditors of such an estate must sue in their own name for losses or wrongs to them individually. However, statements of the Supreme Court of Idaho in McTamany v. Day, supra, upon which the Receiver herein most strongly relies may not be so lightly dismissed. In that case an individual depositor of an insolvent bank which was in receivership sought to bring an action against the officers and directors.

Some of the acts complained of being:

"It was also alleged that on April 27, 1910, said bank filed with the bank commissioner of the State of Idaho a false and fraudulent report of its resources and liabilities, and the complaint then proceeds to set forth wherein said report was false. It is also alleged that said bank on November 2, 1910, made another false and fraudulent report in writing to the bank commissioner, and it is also alleged wherein that report was false and fraudulent, and that said bank caused an abstract of false and fraudulent reports to be published in a newspaper in said county of Shoshone, and that each of the defendants had full notice and knowledge of the making, filing, and publishing of said false and fraudulent reports, or that by the exercise of reasonable diligence they could have known that said reports were false and fraudulent."

Separate demurrers were filed by the defendants, the main ground being that the plaintiff could not as an individual prosecute the action as a receiver had been appointed and it was his duty to recover all sums of money as are recoverable for the benefit of all of the creditors of the bank. In affirming the action of the trial court, in sustaining the demurrers, the Supreme Court summarized the grounds upon which the plaintiff sought recovery thusly [23 Idaho 95, 128 P. 565]:

"Now the grounds of recovery alleged in the complaint are (1) the illegal payment of dividends; (2) *the making and publication of false reports;* (3) the unlawful permitting of excessive loans; (4) that the plaintiff made deposits in the bank while it was insolvent under circumstances whereby the defendants could have known of the insolvency of the bank had they exercised proper diligence. *In case of a recovery on all or either of said grounds, the amount recovered is an asset of the bank, and in this case any action brought to recover the same should be by the receiver.'*

"*If the bank has suffered loss* on account of the directors having declared dividends contrary to the provisions of section 2981, Rev.Codes, *or has suffered loss* in consequence of the directors' fraud, gross negligence, or willful breach of duty, after such corporation is placed in the hands of a receiver, it is the duty of the receiver, as the representative of all concerned, to proceed and collect such illegal dividends and all other claims of such corporation due said bank by contract or caused by the fraud, gross negligence, or willful breach of duty of the officers thereof, so that whatever may be recovered may be properly distributed among all of the creditors of the bank as the law or court may direct. See Tiffany on Banks and Banking, p. 304 et seq." [Emphasis added by Judge].

So we observe that contrary to what we have heretofore stated the Idaho Court has appeared to hold that the making and publication of the false reports were actionable in the receiver's name as an asset of the bank in behalf of its creditors. In view of the great weight of authority to the contrary regarding such false reports, however, we believe the Idaho Court intended to and did specifically qualify such holding by the paragraph following it next above. Such paragraph, we note, is to the effect that such false reports are actionable by the receiver *only in the event the bank itself suffered losses* by reason thereof. We believe this reasoning reconciles such holding with the majority view that the receiver may only recover for losses actually suffered by the corporation and incidentally by its creditors. Otherwise we are inclined to assume that because of the many other costly losses to the bank in the McTamany case, such as the illegal payment of dividends and the unlawful permitting of excessive loans, the Supreme Court inadvertently "threw the tail in with the hide" by its statements in regard to the false reports.

 Regarding the Receiver's contentions that the complaint states a cause of action contrary to our foregoing conclusions, he argues it to show the appellee

Banks (1) joined and aided the Lowrys, et al., in misappropriating and converting the assets of Texas Mutual, (2) individually misappropriated and converted assets of Texas Mutual when they paid themselves back the sums which they had credited to the corporation's account, (3) are estopped by reason of their misrepresentations and concealments to deny that such sums were the absolute capital assets of Texas Mutual. However, as for actually having individually misappropriated or converted the sums misrepresented, it is difficult to construe the allegations of the complaint otherwise than that the banks made legitimate loans or credits to Texas Mutual's account, and thereafter accepted legitimate repayments of the same to themselves. The offense was not the making of the loans and credits, but the representations or acts in aid thereof, to the effect that such sums were unencumbered cash assets of Texas Mutual. We are therefore back to the fact that the only cause of action charged was the making of false representations which did not damage Texas Mutual. Such being the situation, the banks did not, and could not have, aided the Lowrys, et al., in converting these very sums of money by accepting repayment of the same. As we have heretofore stated, the complaint is replete with allegations of various acts and transactions by the Lowrys, et al., which resulted in the conversion and misappropriation of other assets of the company. There are over 100 pages devoted to such transactions. There are no allegations, however, essential to a finding that any of the appellees participated in a conspiracy to divert such other assets. The Receiver does not assert, nor do his pleadings, any concert of action or common design on the part of any of the appellees with the Lowrys, et al., to convert or misappropriate any of the assets of Texas Mutual. A common design between the parties is the essence of a conspiracy. There must be intentional participation in the transactions with a view to the furtherance of the common design. Standard v. Texas Pacific Coal & Oil Co., Tex.Civ.App., 47 S.W.2d 443; Palatine Ins. Co. v. Griffin, Tex.Civ.App., 202 S.W. 1014. The only allegations in the complaint of any diversion of corporate assets are directed solely at the Lowrys, et al., and none of the specific acts alleged against the appellees as first set out hereinabove can be construed as evidencing any intent or design on their part in aid of the alleged misappropriation of such assets. The Receiver does cite two cases, which, at first blush, appear to be authority for his proposition that the banks converted assets of Texas Mutual when they allowed themselves to be repaid the sums so loaned or credited to the account of Texas Mutual. In those defunct corporation cases of Golden v. Cervenka, 278 Ill. 409, 116 N.E. 273, and Dunagan v. Bushey, 152 Tex. 630, 263 S.W.2d 148, defendant banks made personal loans to third parties other than the corporations knowing that the sums loaned were to be deposited to the corporate accounts and represented to State authorities as capital assets of such corporations in order to secure the right to engage in business. After State permits had been issued the banks then paid themselves these same sums of money out of the corporate accounts in extinguishment of the third parties' debts. The courts, of course, in effect, held the banks liable for the conversion of such corporate assets. There lies the features distinguishing the facts in this case: The sums received by the appellee banks here were used to extinguish loans made to Texas Mutual, not to third parties.

By the (2nd) paragraph, pages (494, 495) of this opinion we have summarized the estoppel counts of the complaint to which reference is now made. "An estoppel is defensive in character. It does not create a cause of action. Its function is to preserve rights, and not bring into being a cause of action." Southland Life Ins. Co. v. Vela, 147 Tex. 478, 217 S.W.2d 660, 663. The Receiver, conceding this to be correct, submits that he has not sought to create a cause of action by such counts

alone. To the contrary, he contends that his estoppel counts are based upon actionable wrongs against the parties whom he represents, i. e., wrongs of misrepresentation, concealments, conversions, etc. However, we believe all our foregoing conclusions have fully dealt with such contention to the extent that further discussion would be repetitious. Suffice it to say that we are of the opinion that the Receiver has plead no wrong actionable in himself.

■ With the exception of our discussion just above, regarding the appellee banks, our conclusions in connection with the misrepresentation phase of the conspiracy charged, embraced the liability of all appellees herein. To that extent, the liability of appellees Kohler, Thompson and Carr have been treated. However, there are portions of the complaint which plainly allege Kohler to have been intimately involved with the Lowrys, et al., in transactions which directly and proximately resulted in the loss to Texas Mutual of many thousands of dollars. For instance, paragraph 219 of the complaint charges him, and other directors, to have illegally declared dividends in excess of $42,000 during the company's insolvency. Many other specific acts of mismanagement are charged which allegedly resulted in much financial loss to Texas Mutual. We are therefore of the opinion that the trial court erred in dismissing the complaint as to appellee Kohler.

The Receiver has brought this action under and by authority of the District Court, 53rd Judicial District, Travis County, Texas, appointing him receiver of Texas Mutual. The order of appointment reads in part:

> "* * * Receiver is hereby given all equity powers and authority under any and all statutes or under the common law in this state authorizing the appointment of a receiver and particularly all authority contained in Article 21.28 of the Insurance Code of Texas and as representative of Texas Mutual

Insurance Company, its creditors, policyholders and members, and said receiver is duly authorized without further order of this court, to file, prosecute any suit or suits * * * deemed by said receiver to be necessary to protect properly all of the interested parties * * *."

Therefore, he has taken the position that by reason of such order he further has the right, authority and duty to recover against all of appellees herein. He then contends that the lower court's order of dismissal countermanded the order of the receivership court and constituted a collateral attack thereon.

■ Again, our foregoing conclusions have fully dealt with the Receiver's right to prosecute the action. The order of appointment attempts to bestow no greater powers in the Receiver than the law prescribes. We believe that Article 21.28 of the Insurance Code, therein referred to, authorizes only those powers consistent with this opinion in these circumstances. We do not agree that the order of dismissal constitutes a collateral attack upon such court's orders. Rather, we are of the opinion that the order of dismissal was the result of a careful judicial construction of the scope, meaning, and intent of such order of appointment. "The determination by interpretation of the scope and effect of a judgment is neither a direct nor a collateral attack thereon." State v. Reagan County Purchasing Company, Tex.Civ.App., 186 S.W.2d 128, 136. "It is always proper to consider what the judgment should have been since it will be presumed that the court intended to adjudicate according to law upon the facts of the case, and of two possible interpretations of the language of the judgment that one will be adopted which makes it correct and valid in preference to one which makes it erroneous." From Freeman on Judgments, 5th Ed., p. 132 and quoted with approval in Austin v. Conaway, Tex.Civ.App., 283 S.W. 189: "The mere fact that a judgment is ques-

·tioned in some respects does not necessarily mean that it is attacked either directly or ·collaterally." 25 Tex.Jur. p. 740.

We are of the opinion the trial court's judgment was correct in dismissing the Receiver's cause of action against the appellees, The American National Bank of Beaumont, The First National Bank of Beaumont, V. C. Thompson and Sampson ·Carr. That part of the judgment is accordingly affirmed. The judgment dismissing appellee Carl A. Kohler is reversed and remanded.