# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2010

No. 10-10617

Lyle W. Cayce
Clerk

RALPH S. JANVEY

Plaintiff–Appellee

v.

JAMES R. ALGUIRE, VICTORIA ANCTIL, TIFFANY ANGELLE, SYLVIA
AQUINO, JONATHAN BARRACK, ET AL. 1; TERAL BENNETT, SUSANA
CISNEROS, RON CLAYTON, JAMES FONTENOT, MARK GROESBECK,
ET AL. 2; and JASON GREEN

Defendants–Appellants

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division.

Before STEWART, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

The Securities Exchange Commission ("SEC") brought suit against
Stanford Group Company ("SGC"), along with various other Stanford corporate
entities, including Stanford International Bank ("SIB"), for allegedly
perpetrating a massive Ponzi scheme.[1]  The district court appointed Robert
Janvey (the "Receiver") to marshal the Stanford estate.  In November, this Court

---

[1] The alleged Ponzi scheme concerned more than one hundred corporate entities
controlled by R. Allen Stanford.  The Receiver obtained a preliminary injunction maintaining
a freeze on accounts that belong to 117 of the defendants.  Where the distinction is of no
moment, we will refer to the corporate entities collectively as "Stanford."

No. 10-10617

heard *Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009),[2] a case concerning the frozen accounts of Stanford investors. Although the Fifth Circuit ordered the district court to thaw the accounts of the Stanford investors, the Receiver subsequently obtained a preliminary injunction against numerous former financial advisors and employees of SGC, freezing the accounts of those individuals pending the outcome of trial.[3]

In this interlocutory appeal, the Employee Defendants contend that the district court should have granted their motion to compel arbitration, and that the district court had no power to grant the preliminary injunction when the motion to compel arbitration was pending. Additionally, the Employee Defendants claim that the district court abused its discretion when it granted the preliminary injunction, and that the Receiver's calculation of the amounts subject to the injunction was overly broad. The Bennett Defendants appeal separately, claiming that the district court erroneously found that SGC operated as a Ponzi scheme.

We hold that (1) the district court had the power to decide the motion for preliminary injunction before deciding the motion to compel arbitration; (2) the district court did not abuse its discretion in granting a preliminary injunction; (3) the preliminary injunction was not overbroad; (4) the district court acted within its power to grant a Texas Uniform Fraudulent Transfer Act ("TUFTA") injunction rather than an attachment; and (5) the Receiver's claims are not subject to arbitration.

---

[2] Judge Dennis authored the opinion, joined by Judge Garwood and Judge Prado.

[3] There are numerous appellants, represented by various counsel. The district court describes the approximately 330 former Stanford employees collectively as "Employee Defendants." We will continue this practice for the appellants in this proceeding. When we have need to refer to the specific arguments by a particular group of defendants or a single defendant, we will refer to the seventy-six financial advisor defendants who together filed a brief as "FA Defendants," to the defendants who filed the Teral Bennett *et al.* brief as the "Bennett Defendants," and to Jason Green as "Green."

2

No. 10-10617

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.    Stanford, the Receiver, and *Adams***

This appeal shares its background facts with this Court's prior *Adams* opinion:

> This case arises out of an alleged multi-billion-dollar Ponzi scheme perpetrated by the Stanford companies . . . . According to the SEC, the companies' core objective was to sell certificates of deposit ("CDs") issued by [SIB]. Stanford achieved and maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments. For almost 15 years, [SIB] represented that it consistently earned high returns on its investment of CD sales proceeds, ranging from 12.7% in 2007 to 13.93% in 1994. In fact, however, [SIB] had to use new CD sales proceeds to make interest and redemption payments on pre-existing CDs, because it did not have sufficient assets, reserves and investments to cover its liabilities.
>
> The SEC filed suit against R. Allen Stanford, [SIB], and related companies on February 16, 2009. At the SEC's request, the district court issued a temporary order restraining the payment or expenditure of funds belonging to the Stanford parties. The district court also appointed [the Receiver] for the Stanford interests and granted him the power to conserve, hold, manage, and preserve the value of the receivership estate.

588 F.3d at 833.  At the time the SEC filed suit, Stanford should have held assets of greater than seven billion dollars, but actually held assets of less than $1 billion.

Post-appointment, the Receiver froze millions of dollars in assets.  These frozen accounts allegedly contained funds dispersed by Stanford as purported interest on CDs, reimbursement of CD principle, or compensation to former Stanford employees.  After time for review and assessment, the district court set a date to thaw the frozen assets and ordered the Receiver to complete his review. *Adams*, 588 F.3d at 833.  The Receiver subsequently filed a series of claims, naming hundreds of CD investors and the Employee Defendants as "relief

defendants," and seeking to recover funds from the frozen accounts. The district court severed the investor defendants from the Employee Defendants.

The Receiver sought a preliminary injunction to continue the freeze as to the investor defendants, which the district court granted in part and denied in part, maintaining the freeze of the accounts of various CD investors who had received payments of interest on their CDs. In *Adams*, the Fifth Circuit vacated the district court's grant of a preliminary injunction. 588 F.3d at 835. The *Adams* Court found that the CD investors could not be properly named as "relief defendants" because the CD investors had actual ownership interests in the CDs and any proceeds of the CDs. *Id.* at 834–35. This Court did not address the Employee Defendants' frozen accounts.

**B.    Post-*Adams* Developments, the Employee Defendants, and the Instant Appeal**

The remaining frozen accounts represent accounts held at Pershing LLC and JP Morgan Clearing Corp. by the Employee Defendants. After *Adams*, the Receiver amended his complaint against the Employee Defendants, leaving claims only for fraudulent transfer or unjust enrichment.

The Receiver subsequently reached a series of compromises with the Employee Defendants, allowing for partial releases of their frozen assets. The district court eventually entered an agreed order (the "April 6th Order"), releasing all but "(1) commissions earned from the sale of SIB CDs; (2) SIB quarterly bonuses; and (3) branch managing-director quarterly compensation."

With the account freeze due to expire, the Receiver moved for a preliminary injunction to continue the freeze as to the funds named in the April 6th Order. The Receiver claimed that the three named classes of funds represented payments by Stanford to the Employee Defendants from the proceeds of the Ponzi scheme and therefore constituted fraudulent transfers, entitling the Receiver to disgorgement of those assets.

No. 10-10617

The Employee Defendants opposed the preliminary injunction and moved to compel arbitration. They based their motion to compel on the existence of Promissory Notes between the Employee Defendants and SGC. The Promissory Notes concerned upfront loan payments that SGC paid to the Employee Defendants when they joined Stanford. The Promissory Notes contained a broad arbitration clause, which provided that any dispute "arising out of or relating to this Note . . . would be submitted and settled by arbitration pursuant to the constitution, bylaws, rules, and regulations of the Financial Industry Regulation Authority (FINRA)" or the National Association of Securities Dealers ("NASD"), FINRA's predecessor. The Employee Defendants argued that because the Receiver "stood in the shoes" of SGC, the Receiver was also bound by the arbitration clause between the Employee Defendants and SGC.

The district court granted a temporary restraining order, and then granted the preliminary injunction. The district court did not decide the merits of the motion to compel arbitration, finding that it had the power to issue a preliminary injunction pending resolution of that matter. Additionally, the district court distinguished between a preliminary injunction under the Texas Uniform Fraudulent Transfer Act ("TUFTA") and a writ of attachment, expressly granting the former. In granting the preliminary injunction, the district court continued the account freeze as to the amounts named in the April 6th Order. Various Employee Defendants appealed.

## II. DISCUSSION

Various groups of the Employee Defendants have set forth five issues on appeal: (1) whether the district court had the power to grant a preliminary injunction before deciding the motion to compel arbitration; (2) whether the district court abused its discretion when it granted the preliminary injunction; (3) whether the district court's preliminary injunction is overbroad; (4) whether the district court properly granted a preliminary injunction rather than a writ

No. 10-10617

of attachment; and (5) whether the Receiver's claims against the Employee Defendants are subject to arbitration. We address the five issues in turn.

## A. Jurisdiction and Standard of Review for the Preliminary Injunction Order

The Panel has jurisdiction over the appeal of the district court's preliminary injunction under 28 U.S.C. § 1292(a)(1).[4]

While "the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32 (1975). Despite this deferential standard, "a decision grounded in erroneous legal principles is reviewed de novo." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citations omitted) (quotation marks omitted). As to each element of the district court's preliminary-injunction analysis, the district court's findings of fact "are subject to a clearly-erroneous standard of review," while conclusions of law "are subject to broad review and will be reversed if incorrect." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (citations and quotation omitted).

## B. Power to Grant Preliminary Injunction

### 1. The Parties' Arguments

The Employee Defendants argue that the district court lacked power to issue a preliminary injunction because the Receiver's claims against them are subject to arbitration. The Receiver argues that case law, the FINRA rules, and common sense allows the district court to issue a preliminary injunction pending its resolution of a motion to compel arbitration. The district court found that it

---

[4] The parties dispute whether the district court retained the power to grant the preliminary injunction while the motion to compel arbitration was pending. We address this dispute below.

had power to grant preliminary relief before deciding whether to compel arbitration. We agree with the district court.

While the Employee Defendants acknowledge that the grant of a preliminary injunction lies within a district court's discretion, they posit that a motion to compel arbitration strips the district court of its power to grant an injunction. The Employee Defendants contend that (1) SGC is and was subject to arbitration for this dispute at all relevant times because it is a member of FINRA and it is bound under the broad arbitration clause of each Promissory Note, which requires any controversy arising out of or related to the Note be submitted to arbitration pursuant to FINRA rules; (2) the dispute in this action is arbitrable because the Receiver became subject to the FINRA rules and the arbitration clauses when he stepped into the shoes of the received entity he represents; and (3) the FINRA rules do not contemplate pre-arbitration injunctive relief nor allow court-ordered injunctions lasting longer than 15 days. The Employee Defendants argue that because the dispute is arbitrable and subject to the FINRA rules, the district court did not have the discretion to issue injunctive relief; it only had the power to decide the motion to compel arbitration. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

The Employee Defendants also argue that cases from both sides of a circuit split support their contention that the district court does not have power to enter an injunction. The circuit split concerns the power of a district court to issue an injunction while arbitration is pending. The Fifth Circuit acknowledged the circuit split in *RGI, Inc. v. Tucker & Associates, Inc.*, 858 F.2d 227, 229 (5th Cir.

1988), but did not enter the fray.[5]  The Employee Defendants contend that once again we may avoid the fray and still decide the issue in their favor because both the Eighth Circuit, on one side of the split, and the Seventh Circuit, on the other side of the split, would not permit an injunction here.  The Eighth Circuit held that "where the [Federal Arbitration Act ("FAA")] is applicable to the dispute between the parties and no qualifying language has been alleged, the district court errs in granting injunctive relief" because the judicial inquiry required to determine "the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1292 (8th Cir. 1984).  The Seventh Circuit held that the district court may only issue injunctive relief that is effective only until the arbitration panel is able to address whether the equitable relief should remain in effect.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215–16 (7th Cir. 1993).

The Receiver responds that the district court's broad power to preserve the status quo is well-established and supported by case law, FINRA rules, and common sense.  The Receiver notes that "even after a district court decides that a case is subject to arbitration, most federal authority permits the district court to issue a preliminary injunction to maintain the status quo pending arbitration."  Further, the Receiver points out that under FINRA Rule 13804, (1) parties can seek court-ordered temporary injunctive relief even where the case is subject to mandatory arbitration, and (2) if a court issues a temporary injunction in a dispute subject to arbitration, an arbitration panel will hold a hearing within 15 days to determine whether to continue the injunctive relief.

---

[5] In *RGI*, we found that we need not decide whether a district court may issue a preliminary injunction while arbitration is pending because the agreement in that case clearly provided for preliminary injunctions.  *Id.* at 231.  The parties do not attempt to establish or distinguish similar facts here.

No. 10-10617

The Receiver argues that if FINRA rules allow court-ordered injunctive relief when a party loses on the motion to compel arbitration, then he is entitled to such relief while the motion is still pending. Finally, the Receiver notes that a rule that would prohibit the district court from preserving the status quo when a motion to compel arbitration is filed would enable any party "to strip the trial court of its authority to enjoin the party's conduct simply by filing a motion to compel arbitration."

### 2.   Analysis

In its order, the district court relied on its equitable powers to preserve the status quo, and expressly reserved the question of whether the Receiver's claims were subject to arbitration. In so doing, the district court noted that the cases in the circuit split did not specifically address the issue in this case: whether a court may preserve the status quo *pending its resolution of a motion to compel arbitration*, not pending the actual arbitration itself. We agree with the district court: The district court can grant preliminary relief before deciding whether to compel arbitration.

The language of the FAA does not touch on the ancillary power of the federal court to act before it decides whether the dispute is arbitrable. The federal law of arbitration is governed by the FAA. 9 U.S.C. §§ 1–16. As the Employee Defendants note, the Supreme Court has consistently expressed a strong preference for arbitration. *See Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984) ("In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration . . . ."). However, these sections do not provide guidance on the issue of whether a court may issue a preliminary injunction before deciding whether the dispute is arbitrable. Section 3 provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, *upon being satisfied that the issue involved in such*

9

> *suit or proceeding is referable to arbitration under such an agreement*, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).  Similarly, section 4 provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . .  The court shall hear the parties, and *upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue*, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4 (emphasis added).  Section 3 only speaks to what the court should do once it is satisfied that the issue is referable to arbitration.  Similarly, section 4 mandates that the court must direct the parties to proceed to arbitration *only after it is satisfied* that there is no issue as to whether a party failed to comply with the arbitration agreement.  Both of these sections speak only to situations after the court has decided arbitration must ensue.

Here, the court has not yet made up its mind as to arbitrability.  The district court relied on its equitable powers to preserve the status quo, but expressly reserved the issue of whether the Receiver's claims were subject to arbitration for resolution at a later date.  Nothing in the FAA controls a district court's approach to its docket.  While the Supreme Court has stated that "Congress'[s] clear intent, in the [FAA], [was] to move the parties to an *arbitrable* dispute out of court and into arbitration as quickly and easily as possible[,]" there is nothing to control the district court's expeditious determination of arbitrability.  *Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983) (emphasis added).

No. 10-10617

The cases cited by the Employee Defendants also do not bar the exercise of the district court's equitable powers here. The *RGI* Court found that "[t]he crux of the problem [in the circuit split] is whether the commands of the [FAA] require that a federal court immediately divest itself of any power to act to maintain the status quo *once it decides that the case before it is arbitrable*." *RGI*, 858 F.2d at 228–29 (emphasis added). Here, however, the district court has not yet decided whether the case is arbitrable and thus the circuit-split cases are not applicable. The Receiver's request for a preliminary injunction was entered before the motion to compel arbitration. We agree with the district court that if we were to reverse and hold that the district court must stop everything and consider the motion to compel arbitration, such a holding

> would create a harsh procedural rule: in order to avoid irreparable injury, motions to compel arbitration where a request for injunctive relief is involved must be resolved before any temporary restraining order expires. Such a rule would be both burdensome for district courts and impracticable, given the time it takes motions to compel arbitration to become ripe for ruling, even if no discovery is required.

(Supp. R. #3 at 4273 n.5.)

Though the circuit-split cases do not apply here, the reasoning of those circuits holding that a court may issue an injunction pending arbitration applies here.[6] As explained by the First Circuit, "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." *Teradyne v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir.1986). Here, the

---

[6] Given that the facts at issue here do not require us to enter the circuit split, we reserve for another day the issues of whether a district court divests itself of the discretion to maintain the status quo once it decides the case before it is arbitrable, and if not, what the limits of that discretion may be.

district court merely sought to preserve the status quo *before* deciding the motion to compel arbitration, and by doing so they sought to preserve the meaningfulness of any arbitration that might take place.

Even if applicable to the facts here, the Seventh Circuit case cited by the Employee Defendants would not bar the preliminary injunction issued by the district court. In *Salvano*, the Seventh Circuit held that the district court may issue injunctive relief only until the arbitration panel is able to address whether the equitable relief should remain in effect. 999 F.2d at 215–16. In the instant case, the district court expressly stated that if it decides to compel arbitration, the defendants may ask the district court to reconsider the preliminary injunction in light of Fifth Circuit precedent and the terms of the contracts.

The matter of arbitrability has not yet been decided, and the district court did not overreach when it decided the preliminary injunction motion.

## C.   Decision to Grant Preliminary Injunction

The four elements a plaintiff must establish to secure a preliminary injunction are:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum*, 566 F.3d at 445 (quotation marks omitted). The Receiver bore the burden of establishing each element. *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). The district court analyzed each of the elements in its grant of the preliminary injunction to the Receiver. The Employee Defendants challenge all aspects of the district court's analysis. We disagree with the Employee Defendants that the district court abused its discretion in issuing the preliminary injunction. We address each element in turn, reviewing the district court's ultimate decision to grant the preliminary

injunction and its findings of fact for abuse of discretion and its legal determinations de novo. *Byrum*, 566 F.3d at 445.

### 1.    Likelihood of Success on the Merits

The district court did not err in finding the Receiver carried his burden of proving likelihood of success on the merits.  To satisfy the first element of likelihood of success on the merits, the Receiver's evidence in the preliminary injunction proceeding "is not required to prove [his] entitlement to summary judgment." *Byrum*, 566 F.3d at 446; *see also* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." (footnote omitted)).  To assess the likelihood of success on the merits, we look to "standards provided by the substantive law." *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (citation omitted).  Here, the Receiver contends that there is liability under TUFTA.  Under TUFTA, the trial court may find substantial likelihood of success on the merits when it is "presented with evidence of intent to defraud the creditor." *See Tanguy v. Laux*, 259 S.W.3d 851, 858 (Tex. App.—Houston [1st Dist.] 2008) (citing *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex.App.—Houston [1st Dist.] 2002)).

The Receiver and the Employee Defendants offer competing versions of what evidence is necessary to satisfy TUFTA's requirements.  The Bennett Defendants contend that the Receiver failed to establish that Stanford operated as a Ponzi scheme.[7]  The FA Defendants argue that because they received their compensation from SGC and not SIB, they did not receive compensation from the

---

[7] The Bennett Defendants do not tie this argument to any element of the preliminary injunction standard, instead lodging a general objection to the district court's determination that Stanford operated as a Ponzi scheme.  Because the Ponzi scheme determination has the greatest impact on the likelihood of success element, we address the Bennett Defendants' argument in this section.

Ponzi scheme.  The Employee Defendants contend that the district court erred by allowing the Receiver to group all the former employees of Stanford together rather than requiring the Receiver to prove that each individual Defendant received fraudulent transfers of money from the Stanford scheme.  Finally, the Employee Defendants also contend that the Receiver failed to follow the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  The Receiver responds that (1) there is sufficient evidence to prove Stanford operated as a Ponzi scheme from the very beginning; (2) the Receiver has presented sufficient evidence to prove that each individual Defendant received transfers of money from the Stanford Ponzi scheme; and (3) this Court need not decide whether the Receiver's pleading satisfies the rules, and even if it did, Rule 9(b) does not apply to fraudulent transfer cases.

The district court agreed with the Receiver.  It found that there was a Ponzi scheme and held that "'transfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception.'" (Supp. R. #3 at 4277 (quoting *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007) (unpublished) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006))).)  Therefore, the district court found that the Receiver satisfied his obligation to show an actual intent to defraud under TUFTA.  The district court further found that the Receiver presented sufficient evidence that the assets implicated by the injunction request "represented transfers of Stanford CD proceeds."

We address first whether the Receiver presented sufficient evidence that Stanford operated as a Ponzi scheme, then discuss whether the Receiver adequately established that the Employee Defendants received proceeds of a fraudulent transfer, and finally address whether this satisfies the requirements of this element.

**a.     Whether Stanford Operated as a Ponzi Scheme**

14

No. 10-10617

The Bennett Defendants spend the bulk of their brief disputing whether Stanford operated as a Ponzi scheme *ab initio*. The FA Defendants separate SGC from SIB, and claim that the Receiver failed to establish that SGC, the entity that provided compensation to the FA Defendants, was a Ponzi scheme. In large part, the Receiver relies upon the guilty plea of James Davis (the "Davis Plea"), the former Chief Financial Officer of SIB, to demonstrate that the Stanford enterprise operated as a Ponzi scheme. The district court relied upon the Davis Plea in its order, along with the declarations of the Receiver's forensic accountant, Karyl Van Tassel, to find that a Ponzi scheme existed. We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.

A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." BLACK'S LAW DICTIONARY 1198 (8th ed. 2004); *see also U.S. v. Setser*, 568 F.3d 482, 486 (5th Cir. 2009) ("in a classic Ponzi scheme, as new investments [come] in . . ., some of the new money [is] used to pay earlier investors"). The Second Circuit also provides a good description of a Ponzi scheme:

> A [P]onzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995). This Circuit has found that a Ponzi scheme "is, as a matter of law, insolvent from its inception." *Warfield*, 436 F.3d at 558 (citing *Cunningham v. Brown*, 265 U.S. 1, 7–8 (1924)).

No. 10-10617

The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as Ponzi scheme. In his plea, Davis, who is singularly positioned to provide insight into the workings of Stanford, admitted that the "continued routine false reporting . . . upon which CD investors routinely relied in making their investment decisions, in effect, created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds." This statement reflects a classic Ponzi scheme and directly contradicts the Bennett Defendants' assertion that the district court relied upon a novel definition of a Ponzi scheme in its order. The Van Tassel Declarations also provide clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme:

> We found within SIB's accounting records worksheets used to derive fictitious SIB revenues back to 2004. The Ponzi scheme conspirators would simply determine what level of revenues SIB needed to report in order to both look good to investors and regulators and to purport to cover CD obligations and other expenses. They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative) of a fictitious investment allocation.

Van Tassel then goes on to specifically itemize how specific returns were based on fictitious asset totals.

The Bennett Defendants' argument that the Receiver failed to establish, and that the district court incorrectly assumed, that the Stanford entities constituted a Ponzi scheme *ab initio* is unavailing. The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*. In outlining the

16

factual basis for the guilty plea, the Davis Plea describes how in 1988, Stanford directed Davis to "make false entries into the general ledger for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators" shortly after opening Guardian International Bank, as SIB was then known, in Montserrat. The Plea further states that Stanford closed Guardian's operations in Montserrat in 1989 and moved the banking operations to Antigua under the name of SIB to avoid heightened scrutiny from bank regulators in Montserrat.

Finally, the FA Defendants' position that SGC should be separated from SIB is of no moment. As made clear by the Van Tassel Declarations, SGC received the bulk of its revenue from commissions for the sale of the SIB CDs and fees for other services it provided to SIB related to the CD investment portfolio. The Receiver seeks to recoup those proceeds because they were the assets of the alleged Ponzi scheme. The district court did not err when it found, for the purposes of this preliminary injunction proceeding, that Stanford operated as a Ponzi scheme.

### b. Whether the Receiver Offered Sufficient Proof of the Source of the Frozen Accounts.

The Employee Defendants also argue that the district court erred in grouping all the transactions rather than examining evidence of claims against individuals. Contrary to the Employee Defendants' assertion, the district court found that the Receiver came forward with "competent evidence that each individual [Employee Defendant] received transfers of money representing CD sale proceeds from the Stanford Ponzi scheme." We agree. The Receiver's evidence is a spreadsheet in the Van Tassel Declarations that lists each former employee, the form of compensation (loan, commission, or quarterly bonus), and the amount that Stanford paid each employee. The Van Tassel Declarations

sufficiently establish that Stanford paid the Employee Defendants from the alleged Ponzi scheme for the purposes of the preliminary injunction proceeding.

### c.     Likelihood of Success on the Merits

The district court did not abuse its discretion in finding the Receiver carried his burden of proving a substantial likelihood of success on the merits for his TUFTA claim. TUFTA requires that the debtor *transferor* make the transfer "with actual intent to . . . defraud any creditor of the debtor." TEX. BUS. & COM. CODE ANN. § 24.005(a)(1). "In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (citing *Warfield*, 436 F.3d at 558). In other words, "'the transferees' knowing participation is irrelevant under the statute' for purposes of establishing the premise (as opposed to liability for) a fraudulent transfer." *Id.* (analyzing TUFTA) (quoting *Warfield*, 436 F.3d at 559 (analyzing Washington state law)). The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed—thereby obviating the need to prove fraudulent intent of the *transferees*—and sufficient proof that each individual received transfers of money from the Ponzi scheme. The Defendants did not refute this by showing that they are likely to succeed in proving a TUFTA statutory affirmative defense. Consequently, the district court did not err in finding a substantial likelihood of success.

The parties dispute whether Rule 9(b) applies to this case and whether this affects the district court's finding of substantial likelihood of success. The Employee Defendants argue that the Receiver was obligated to abide by Rule 9(b)'s heightened pleading standards for his fraud claims, and that he failed to meet this standard when he "lump[ed] together" the claims against all former Stanford employees. The Receiver asserts that Rule 9(b) does not apply to

fraudulent transfer cases. We need not and do not address the issue of whether heightened pleading is required. As the district court notes in its Preliminary Injunction Order, it has not yet ruled on the defendants' pending motions to dismiss. The only question that the district court had to decide on this element in the preliminary injunction proceeding was whether the Receiver had shown a substantial likelihood of *ultimately* succeeding on the merits, *see Doe v. Marshall*, 622 F.2d 118, 119 n.2 (5th Cir. 1980), potential procedural hurdles notwithstanding. The Receiver carried this burden.

### 2.    Threat of Irreparable Harm

The Employee Defendants argue that the Receiver did not carry his burden of proving the second element of the preliminary injunction standard: threat of irreparable harm. The Employee Defendants argue that because the Receiver merely seeks a return of the fraudulently transferred CD proceeds, there is no threat of irreparable harm. The Employee Defendants contend that difficulty securing economic damages is insufficient to demonstrate irreparable harm. The Employee Defendants further argue that the Receiver was required to establish a likelihood that each individual defendant would remove or dissipate the frozen assets but for a preliminary injunction. The Receiver replies that TUFTA itself creates a presumption of dissipation. The Receiver then argues that its inability to collect a money judgment should the Employee Defendants dissipate the frozen accounts is sufficient to show a threat of irreparable harm. Finally, the Receiver agrees with the district court that he is not required to make an individualized showing of likely dissipation.

The district court found that "dissipation of the assets that are the subject of this suit . . . would impair the Court's ability to grant an effective remedy[,]" particularly because much of the relief the Receiver seeks under TUFTA is "equitable in nature and involves the assets that are . . . frozen." The district court further held that the Receiver need not show that each individual

defendant would dissipate the frozen assets absent an injunction. The court reasoned that the Receiver was entitled to a presumption that the Employee Defendants would dissipate the frozen assets absent a preliminary injunction because the assets were fraudulently transferred as part of a Ponzi scheme. We find that the Receiver carried his burden of proving this element.

To satisfy the second element of the preliminary injunction standard, the Receiver must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).[8] In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981); *Parker v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). However, the mere fact that economic damages may be available does not always mean that a remedy at law is "adequate." For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions. *See, e.g.*, *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction"). We have previously stated that where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the

---

[8] The Receiver argues that TUFTA effectively creates a statutory presumption of irreparable harm. We disagree. TUFTA specifically provides that the claimant may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred." TEX. BUS. & COM. CODE § 24.008(a)(3)(A). However, the statute explicitly states that this remedy is "subject to applicable principles of equity and in accordance with applicable rules of civil procedure." TEX. BUS. & COM. CODE § 24.008(a)(3)(A). Clearly, TUFTA contemplates the application of equitable standards, encompassing the usual elements necessary to obtain a preliminary injunction.

property in dispute or its direct, traceable proceeds. *See Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980) ("[E]ven were [plaintiff's] remedy limited to damages, an injunction may issue to protect that remedy." (dicta)). Finally, a showing of "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Id.* (citing *Carter v. Heard*, 593 F.2d 10, 12 (5th Cir.1979)).

We agree with the district court that the Receiver carried his burden of proving this element. First, we agree with the district court that the "Receiver successfully show[ed] that the threatened harm—dissipation of the assets that are the subject of this suit—would impair the [district court's] ability to grant an effective remedy." The relief that the Receiver ultimately seeks is equitable in nature; the Receiver seeks "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." TEX. BUS. & COM. CODE § 24.008(a)(1). In his complaint, the Receiver asks the court for an order (1) establishing that the CD proceeds received by the Employee Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the creditors, and (2) allowing him to withdraw proceeds from the segregated escrow account and add them to the Receivership Estate. He does not seek damages for breach of contract or tort. If the defendants were to dissipate or transfer these assets out of the jurisdiction, the district court would not be able to grant the effective remedy, either in equity or in law, that the Receiver seeks. The assets that the Receiver requests stay frozen are assets that are directly traceable to the Stanford Ponzi scheme and are the subject of this dispute. The Receiver merely asks that those assets continue to be held immovable while his case proceeds to judgment. We do not find that the district court erred in determining that a preliminary injunction was appropriate to protect against monetary asset dissipation.

The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation. *Succession of Roy*, 777 F.2d at 997. Here, the Receiver provided evidence of a massive Ponzi scheme and proof that each individual received proceeds from the fraudulent scheme. This is sufficient to prove the likelihood of each individual removing or dissipating the frozen assets but for the preliminary injunction. Accordingly, we find that the district court did not err in finding that irreparable harm would result in the absence of a preliminary injunction.

### 3. The Balance of Harms and Service of the Public Interest

On these elements, the district court weighed the interests of the Employee Defendants against the interests represented by the Receiver (the creditors) and looked to the broader ramifications of any potential recovery by the Receiver. The district court noted the extremely limited array of assets remaining to provide compensation to Stanford Ponzi scheme victims. The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized. Additionally, the Receiver and the Employee Defendants reached consent agreements to thaw all but certain discrete categories of compensation. These last elements of the district court's preliminary injunction analysis implicate the discretion of that court to craft a remedy and weigh the evidence. We do not believe that the district court abused its discretion when it found that these elements weighed in favor of the Receiver.

### D. Scope of District Court's Grant of Preliminary Injunction

The Employee Defendants also challenge the breadth of the injunction. On appeal, the Employee Defendants renew a number of arguments that they brought before the district court. First, the Employee Defendants contend that any frozen IRA account is exempt from the Receiver's claim. Second, the FA Defendants argue that the account freeze improperly extends to pre-tax amounts because they already paid taxes on those earnings. Third, the FA Defendants

argue that they are entitled to an offset of amounts they lost on their personal investments in Stanford CDs.  We address each of the Employee Defendants' arguments in turn.

### 1.   Frozen IRA Accounts

According to Texas law, IRA accounts are exempt from seizure. TEX. PROP. CODE § 42.0021(a).  However, the party claiming the exemption must establish that she has a legal right to the funds in the IRA to be entitled to the exemption. *Jones v. Am. Airlines, Inc.*, 131 S.W.3d 261, 270 (Tex. App.—Fort Worth, 2004, no pet.).  It is undisputed that some of the frozen accounts are IRA accounts. The Employee Defendants had the burden of proving that they have a right to the funds in the accounts, particularly in light of the Receiver's extensive evidence that the Employee Defendants received these funds as a fraudulent transfer from the Stanford Ponzi scheme.  The mere fact that an account is an IRA account does not automatically entitle the Employee Defendants to the exemption; it does not relieve the Employee Defendants of carrying the burden of proving they have a legal right to the account.  Consequently,  the district court did not err when it kept the IRA accounts frozen under the preliminary injunction.

### 2.   Tax Matters

The FA Defendants argue that the Receiver improperly calculated the amounts represented by the account freeze because the Receiver did not account for taxes paid by the Employee Defendants on the compensation.  The district court rejected this argument, relying heavily on *Donell v. Kowell*, in which the Ninth Circuit declined to offset for taxes paid.  533 F.3d 762, 779 (9th Cir. 2008). The Ninth Circuit first reasoned that if it allowed offsets for amounts paid in good faith as taxes, logic would suggest that the court also permits offsets for bank transfer fees, other fund management fees, and a myriad of other expenses. The court went on to state, "There is simply no principle by which to limit such

offsets . . . . If each net winner could shield his gains in their entirety in this manner, the purpose of UFTA would be defeated, and the multitude of victims who lost their entire investment would receive no recovery." *Id*. at 779. Second, the court found that allowing offsets in even a few areas like taxes paid would "introduce complex problems of proof and tracing into each case," thereby "severely reduc[ing] the receiver's ability to gather what few assets can be located in the wake of a failed Ponzi scheme." *Id*.

Although, as the FA Defendants note, the *Donell* case involved taxes paid by an investor after receiving fraudulent funds, *id*. at 778, we find the *Donell* reasoning persuasive, particularly because there is no basis for this offset in TUFTA. We do not find the district court erred in declining to offset the prepaid tax amounts with respect to the preliminary injunction.

### 3. Losses on Personal Investments

The FA Defendants also argue that the Receiver's figures do not account for the Defendants' losses on their own investments in Stanford CDs. The defendants have not offered any case law or statutory language on point, nor did we find any authority, entitling the Employee Defendants to offsets for their personal losses on Stanford investments. We agree with the district court that the Defendants must seek these amounts through the Receiver's claims process like other creditors.

### E. Type of Equitable Relief Granted

The Employee Defendants also renew their contention that the Receiver obtained, in essence, a writ of attachment, arguing that the "substance" of the Receiver's suit was a request to hold assets "in order to satisfy a money judgment." While the Receiver also requested an attachment, the district court did not consider this request and expressly granted an injunction. In doing so, the district court differentiated between a TUFTA injunction and a writ of attachment.

No. 10-10617

As the district court noted, TUFTA provides for both injunctions and attachments. *See* TEX. BUS. & COM. CODE § 24.008(a)(2) (attachment); *id.* § 24.008(a)(3)(A) (injunction). The district court relied upon *Telephone Equipment Network, Inc. v. TA/Westchase Place, Ltd.*, for the proposition that a claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction. 80 S.W.3d at 610.[9] The district court's reliance was well placed. TUFTA provides that the claimant "may obtain an injunction against further disposition of 'the asset transferred or of other property.'" *Id.* (quoting TEX. BUS. & COM. CODE ANN. § 24.008(a)(3)). Furthermore, the district court's order granting the preliminary injunction lacks the hallmarks of an attachment: namely, a "seizure" or "lien."

The Receiver claims that Stanford fraudulently transferred proceeds from the alleged Ponzi scheme to the Employee Defendants and sought an injunction to prevent the dissipation of those proceeds, now held in the frozen accounts. TUFTA expressly provides for an injunction and the district court exercised its discretion to grant that injunction.

**F.   Motion to Compel Arbitration**

The parties also dispute whether the Receiver's claims against the Employee Defendants are subject to arbitration. The district court did not decide the motion to compel arbitration, but both parties ask this Court to decide this question. As the parties note, the issue has been fully briefed as the Receiver had an opportunity to file a response to the motion to compel arbitration.

---

[9] Although the *Telephone Equipment* court uses the acronym "UFTA," it is apparent that the court cited to and analyzed provisions of TUFTA. *Id.* at 607 ("UFTA lists 11, non-exhaustive 'badges of fraud' to assist in determining whether the debtor made the transfer with the requisite fraudulent intent.") (citing TEX. BUS. & COM. CODE ANN. § 24.005(a)(1)).

25

No. 10-10617

We must first decide whether this issue is before us as a part of the appeal of the preliminary injunction. We have previously held that our "jurisdiction under 28 U.S.C. §1292(a)(1) is not limited to the specific order appealed from." *In re Lease Oil Antitrust Litig.*, 200 F.3d 317, 319–20 (5th Cir. 2000) (citation omitted). To avoid "wast[ing] judicial resources without any offsetting benefit in the form of a fully developed record," we have held that "[j]urisdiction extends to certain related issues that have been sufficiently developed so as not to require further development at the trial court level." *Id.* at 320. We decide this issue to conserve judicial resources and expedite the disposition of this complex case. Refraining to do so would mean money wasted in litigation costs that could be used to compensate victims and more time spent before the Employee Defendants' assets are freed.

Given that the district court has not yet decided this matter, we necessarily review the motion to compel arbitration de novo. Therefore, we "perform a two step inquiry to determine whether to compel a party to arbitrate." *Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884, 886 (5th Cir. 2009) (citation omitted). In the first step, we "determin[e] whether the parties agreed to arbitrate the dispute." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002). This step is further sub-divided into an inquiry into whether "(1) . . . there is a valid agreement to arbitrate the claims and (2) . . . the dispute in question fall[s] within the scope of that arbitration agreement." *Sherer v. Green Tree Servicing*, 548 F.3d 279, 381 (5th Cir. 2008). If we find affirmatively as to the first step, then we must determine whether "any federal statute or policy renders the claims nonarbitrable." *Id.* (quotations and citations omitted). We find that this issue can be decided in the first step: The Receiver, acting on behalf of the creditors, is not party to the arbitration obligations between SGC and the Employee Defendants.

1.    **The Receiver's Powers**

No. 10-10617

The parties expend considerable energy debating what we believe may be distilled to a simple question: in what capacity is the Receiver suing the Employee Defendants?  This question goes to the first sub-part of the first step of the arbitrability assessment.

From the Employee Defendants' perspective, the Receiver stands in SGC's shoes when it seeks to disgorge compensation that SGC paid to the Employee Defendants.  The Employee Defendants contend that the Receiver is bound by any pertinent agreements or rules that govern the relationship between SGC and the Employee Defendants.  Thus, because SGC and the Employee Defendants are members of FINRA, and the Promissory Notes contained arbitration clauses, the Receiver must arbitrate any disputes with them.

The Receiver conceptualizes his rights and obligations differently.  The Receiver contends that he is suing as a creditor or as a representative on behalf of other creditors.  Although the Receiver acknowledges that he is marshaling the assets of the Stanford estate, the Receiver claims that here, he is suing for the fraudulent transfer of assets, and he contends that there is substantial precedent standing for the proposition that receivers may assert the rights of creditors to avoid fraudulent transfers.  Because Stanford's creditors are not party to the arbitration obligations between SGC and the Employee Defendants, the Receiver concludes that he need not arbitrate his claims here.  We believe that the Receiver's characterization of this case and the pertinent case law is more accurate.

The district court appointed the Receiver, "grant[ing] him the power to conserve, hold, manage, and preserve the value of the receivership estate," *Adams*, 588 F.3d at 833, and vesting him "with full power of an equity receiver under the common law as well as such powers as are enumerated herein in this order."  (Supp. R. #3 at 4270.)  It is a general rule that "the receiver cannot recover, except where recovery could have been had by the corporation."

27

No. 10-10617

*Drennen v. S. States Fire Ins. Co.*, 252 F. 776, 789 (5th Cir. 1918). In this sense, a receiver "stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted." *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983). Were this general rule the only rule, we believe the Employee Defendants would prevail and the Receiver would be bound by the arbitration agreements. As is often the case, however, the general rule comes with a few caveats.

A receiver is also "an instrument of court; he is acting also for the stockholders of the corporation, and the creditors of the corporation." *Drennen*, 252 F. at 788. In this manner, receivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the "true" owner. *See, e.g.*, *Setser*, 568 F.3d at 487–88 (discussing the ability of a receiver to enter and search estate property without a warrant and relinquish property to law enforcement officials). It is well settled that, at different points during the pendency of the receivership, a receiver may represent different interests.[10] The Receiver argues here that he should be able to represent the creditors' fraudulent transfer claims, and thereby avoid the matter of arbitrability. We must address whether the Receiver's claims are, indeed, fraudulent transfer claims and whether this posture avoids the arbitration clauses between SGC and the Employee Defendants.

### 2.   Fraudulent Transfer

The Receiver asserts his claims against the Employee Defendants under a theory of fraudulent transfer, claiming that Stanford gave proceeds of the Ponzi scheme to the Employee Defendants. In Texas, fraudulent transfer claims

---

[10] *See, e.g.*, *McGinness v. United States*, 90 F.3d 143, 146 (6th Cir. 1996) (finding, under Ohio law, that "[w]hile it is true that the receiver can acquire no greater legal rights or powers with respect to the property than [the taxpayer] possesses . . . , the receiver's powers are not limited to the legal rights of the debtor-taxpayer, [because] [u]pon his appointment, the receiver succeeded to the rights of not only the debtor, but also the creditor").

are governed by TUFTA. TEX. BUS. & COM. CODE ANN. § 24.008. TUFTA's remedies are expressly directed toward creditors: "In an action for relief against a transfer or obligation under this chapter, *a creditor*, subject to the limitations in Section 24.009 of this code, may obtain" relief. *Id.* § 24.008(a) (emphasis added). The Receiver claims the right to represent "creditors" under that section and to assert his disgorgement claims against the Employee Defendants. To support his position, the Receiver contends that receivers have long held the power to assert creditor claims. We agree.

In analyzing Texas law, we have previously rejected a challenge to a receiver's standing to sue on behalf of creditors. *Meyers v. Moody*, 693 F.2d 1196, 1206 (5th Cir. 1982). The *Meyers* Court quoted from *Cotten v. Republic National Bank of Dallas*, which held that:

> Certainly a receiver for an insolvent insurance corporation . . . has a right to maintain a suit which is necessary to preserve the corporation's assets and to recover assets of which the corporation has been wrongfully deprived through fraud. In such a suit the receiver may be said to sue as the representative of the corporation and its creditors, stockholders and policyholders . . . .

395 S.W.2d 930, 941 (Tex. Civ. App.—Dall. 1965, writ ref'd n.r.e.). This position enjoys wide support.[11]

---

[11] *See Wheeler v. Am. Nat'l Bank of Beaumont*, 338 S.W.2d 486, 495 (Tex. App.—Beaumont 1960, writ granted) ("[T]here are instances where a corporation itself would not be permitted to sue for recovery of a true corporate asset because of its own fraudulent conduct in connection with the loss of the same. However, the receiver would not be so estopped. In such instances he may disaffirm or repudiate the fraudulent acts of the corporate officers and seek recovery of such assets for the benefit of the corporation and creditors. This is the rule in Texas."), *aff'd in part and rev'd on other grounds by* 347 S.W.2d 918 (Tex. 1961); *Guardian Consumer Fin. Corp. v. Langdeau*, 329 S.W.2d 926, 934 (Tex. Civ. App.—Austin 1959, no writ) ("[W]hen the receiver acts to protect innocent creditors of insolvent corporations . . . the receiver acts in a dual capacity, as a trustee for both the stockholders and the creditors, and as trustee for the creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so."); *see also SEC v. Cook*, No. CA 3:00-CV-272-R, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001) (holding that receiver had standing to pursue fraudulent transfer claim)*;* 64 TEX. JUR. 3D *Receivers* § 179 (2010) (noting power); 66 AM. JUR. 2d *Receivers* § 450 (1973) (same).

No. 10-10617

The Employee Defendants provide no contrary support concerning the power of the Receiver to bring a claim under TUFTA, instead contending that the Receiver merely "stands in the shoes" of SGC.[12] We believe that in this case, the Receiver is acting on behalf of creditors, who are not party to the arbitration agreements and therefore he is not bound by the arbitration agreement. We therefore remand to the district court for action in accordance with this decision.

## CONCLUSION

The Receiver is in an unenviable position: although the Stanford estate has many thousands of claimants, there are startlingly few assets to disperse to the Stanford victims. In this appeal concerning the Receiver's attempt to marshal estate assets, we hold: (1) The district court acted within its power when it considered and decided the motion for preliminary injunction before deciding the outstanding motion to compel arbitration. (2) The district court did not abuse its discretion in issuing the preliminary injunction. (3) The preliminary injunction was not an attachment, nor was it overly broad. And (4) The Receiver's claims are not subject to arbitration because he is suing on behalf of estate creditors.

AFFIRMED and REMANDED.

---

[12] The Employee Defendants rely heavily on *Javitch v. First Union Securities, Inc.*, 315 F.3d 619 (6th Cir. 2003), to support their claim that receivers are also bound by arbitration agreements. *Javitch* is easily distinguishable. The *Javitch* receiver brought suit against a number of brokers and financial institutions that provided services to the insolvent corporation. *Id.* at 622. Akin to the instant case, the receiver claimed to bring the claims for defrauded investor creditors. *Id.* at 625. However, the receiver alleged that the defendants provided negligent services and breached fiduciary duties *owed to the insolvent corporation*. *Id.* at 622. Because the *Javitch* receiver sued on behalf of the insolvent corporation, and that corporation had enforceable arbitration agreements with the defendants, the Sixth Circuit held that the receiver was bound to arbitrate. *Id.* at 627. Here, as explained above, the Receiver's fraudulent transfer claims are brought on behalf of defrauded creditors under TUFTA, which looks to the actions of Stanford and not to the services provided by the Employee Defendants. TEX. BUS. & COM. CODE ANN. § 24.005.